

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-1-2005

# Bianchi Trison Corp v. Secretary Labor

Precedential or Non-Precedential: Precedential

Docket No. 04-2093

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Bianchi Trison Corp v. Secretary Labor" (2005). *2005 Decisions.* Paper 932.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/932

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-2093


BIANCHI TRISON CORPORATION,

Petitioner

v.

ELAINE L. CHAO, SECRETARY OF LABOR,

Respondent


On Petition for Review of a Final Order of the
Occupational Safety and Health Review Commission
(OSHRC Docket Nos. 01-1367 and 01-1368)

———

Argued April 7, 2005

BEFORE: BARRY, AMBRO, and GREENBERG, Circuit Judges

(Filed June 1, 2005)

———

Robert G. Walsh (argued)
3819 Southpark Avenue
P.O. Box 1909
Blasdell, NY 14219-0109

    Attorney for Petitioner

Howard M. Radzely
Solicitor of Labor
Joseph M. Woodward
Associate Solicitor for
Occupational Safety and Health
Ronald J. Gottlieb (argued)

Susan Hutton
Ann Rosenthal
United States Department of Labor
Office of the Solicitor
Room S-4004
200 Constitution Avenue, N.W.
Washington, DC 20210

     Attorneys for Respondent

_____

OPINION OF THE COURT

_____

GREENBERG, Circuit Judge.

I. FACTUAL AND PROCEDURAL HISTORY

     This matter is before this court on a petition for review in which the petitioner, Bianchi Trison Corporation (hereinafter "BTC"), challenges the disposition of administrative proceedings instituted by the Secretary of Labor arising from safety and health problems that arose in the demolition, implosion, and clean-up of the Three Rivers Stadium in Pittsburgh, Pennsylvania.[1]  In response to a complaint alleging unsafe conditions at the site, the Occupational Safety and Health Administration (hereinafter "OSHA") made several inspections of the stadium which uncovered conditions that caused the Secretary to bring an enforcement action against BTC under the Occupational Safety and Health Act (hereinafter the "OSH Act") setting forth three citations alleging 45 violations of its standards and proposing substantial penalties.  After a hearing, an administrative law judge (hereinafter "ALJ") upheld 35 of the charges.  BTC then filed a petition for discretionary review with the Occupational Safety and Health Review Commission, but the Commission did not direct the case for review and thus the decision of the ALJ became the final order of the Commission on February 27, 2004.  BTC next filed a timely petition for review of the February 27, 2004 order with this court, which has led to the proceedings culminating in this opinion.

_____

     [1]BTC is a New York State Corporation with its headquarters in Syracuse, New York.

A.  The Demolition of Three Rivers Stadium

We set forth the factual history of the matter as developed at the hearing before the ALJ.  The City of Pittsburgh, through its Sports and Exhibition Authority (hereinafter the "SEA"), owned the stadium.  The SEA, in August 2000, issued a request for bids for a contract to demolish the stadium.  BTC was the successful bidder, and, accordingly, the SEA awarded it the contract.  The demolition project was broken into three distinct phases: pre-implosion demolition, implosion, and cleanup.  In addition to engaging BTC, the SEA utilized AMEC Construction Management (hereinafter "AMEC") as project manager for the demolition and Makin Engineering to oversee contract compliance.  AMEC, in turn, hired Allegheny Asbestos Analysis d/b/a Global Environmental Management to inspect the stadium for asbestos and hazardous materials, other than lead.  BTC, however, retained the responsibility for lead abatement.  Finally, as material in these proceedings, BTC contracted with O'Rourke, Inc. to provide full-time, on-site oversight of all safety and health aspects of the project, including OSHA compliance.

BTC started its work at the stadium on January 2, 2001.  The pre-implosion aspect of the contract required it to remove environmental hazards and prepare the stadium for implosion.  The SEA and AMEC planned a public auction of the stadium's seats, freezers, and other stadium memorabilia during the pre-implosion demolition period.  The demand for stadium seats was greater than expected, and in order to make seats available more quickly than it had thought would be necessary, BTC directed laborers to torch the bolts off the seats.[2]  On January 15, 2001, the memorabilia sale was conducted with the items sold to be picked up by January 19, 2001.

---

[2]BTC vice-president David Bianchi testified that he told O'Rourke president Timothy O'Rourke that BTC did not intend to do any torch cutting before the implosion, although it was possible that employees unexpectedly would run into a pipe or structural steel that needed to be torch cut.  Relying at least in part on this information, O'Rourke advised Bianchi that BTC could use the exposure determination from an earlier demolition project at a National Starch and Chemical Company property as its initial exposure assessment for the stadium.  O'Rourke testified that he did not consider a potential lead hazard prior to the implosion because BTC told him it did not plan to torch cut before then.

During the pre-implosion phase of the demolition project, workers complained to Robert Stanizzo, a representative of the Pittsburgh Building and Construction Trades Council, about safety issues. In response to these complaints, Stanizzo asked Robert McCall, the Director of Safety for the Construction Industry Advancement Program of Western Pennsylvania Fund, to assess the safety situation at the stadium. McCall went to the stadium on January 29, 2001, and met with two local union representatives and examined the safety protections, concluding that they were insufficient. After a meeting at which McCall received an unsatisfactory response from BTC's project manager, he and the union representatives filed a complaint with OSHA's Pittsburgh Area Director, Robert Symanski.

In response to the complaint, OSHA, on January 29, 2001, conducted a safety inspection of the premises. This inspection revealed many safety lapses and led to the issuance of citations alleging numerous violations of the OSH Act. These citations have been referred to as the "Safety Case" in these proceedings.[3]

The issuance of the safety citations, however, did not stop the project and by early February, BTC had demolished most of the interior of the stadium. BTC through a subcontractor imploded the stadium on February 11, 2001, following which for a two-month period BTC processed and removed the remaining concrete and steel debris. BTC assigned teams of employees to torch cut the steel into smaller sizes in order to load them onto the trucks to be hauled away.

On February 13, 2001, several OSHA employees viewed a Pittsburgh television evening news program which aired footage of a worker torch cutting on a painted steel beam. The footage revealed visible smoke fumes, and showed that the workers were not wearing respirators. Their viewing of the program led several OSHA employees to express concern over the potential for lead exposure to the workers.

On February 14, the OSHA assistant area director, Edward Selker, assigned two industrial hygienists to inspect the project for health hazards. But the next day when the two hygienists went to the

---

[3]The violations now at issue stemming from the Safety Case arose from BTC's failure to protect employees from hazards related to floor openings and falling debris.

4

stadium to begin their inspection, BTC denied them entry. The hygienists were able to gain entry to inspect the premises only after contacting the SEA, which granted them permission to inspect the premises. BTC, however, informed the hygienists that all burning work had been suspended that day and thus they were only able to interview the union steward, who indicated that employees had performed pre-implosion torch burning and cutting.[4] This revelation led to OSHA serving both an administrative subpoena on BTC to secure records related to the pre-implosion activities and an inspection warrant to conduct a full inspection.[5] Between February 15 and February 21, BTC implemented a lead protection program at the stadium, its first formal lead program at the site.[6]

OSHA made its full inspection on February 21, during which its inspectors took bulk samples, did air monitoring, and conducted interviews. BTC concurrently performed sampling. The results of both OSHA's and BTC's sampling revealed that the level of exposure to lead at the site was much greater than allowed under the OSH Act. Consequently, the Secretary issued a citation against BTC alleging that there were 29 willful violations of the Lead-in-Construction Industry Standard (hereinafter "the Standard") at the stadium (hereinafter the "Health Case").

### B. The Safety Case

Though the Safety Case involved two citations and numerous infractions, the only issues material to the Safety Case in these

---

[4]OSHA and BTC concurrently took bulk paint samples at various locations in the stadium on February 15.

[5]On February 16, 2001, after OSHA obtained the inspection warrant, the two hygienists returned to the site. But due to rain, BTC's safety consultant advised OSHA that BTC had shut down the burning work until further notice. OSHA and BTC then reached an agreement providing for BTC to notify OSHA when it was resuming burning. On February 21, BTC's project manager notified OSHA that it was ready to return to torch burning operations.

[6]O'Rourke conceded that BTC did not have a written lead compliance plan before February 16, 2001.

5

proceedings relate to fall hazards and hazards relating to falling debris. In this regard, there were allegations stemming from falling debris from BTC's demolition and removal of the stadium's escalators, which BTC removed by burning each escalator's top loose from its supports. Sometimes, when the workers cut an escalator loose, it would not fall, and in that circumstance workers would use a machine to lower it the floor below. After one of the first escalators fell, the work crew, in conjunction with the union stewards, enclosed the areas below the escalators with tape, as a warning not to enter.[7]

BTC contends that when an escalator did fall, it fell onto the concrete level from which it had come and did not cause a risk danger to its employees. Three BTC employees, however, testified about the risk from the failing debris, and documented incidents in which different escalators fell two and four levels.

The BTC workers faced an additional risk during the pre-implosion period when they were exposed to floor holes created by uncovered drain-pipes and expansion joints.[8] BTC employees

---

[7]The citations at issue relating to the removal of the escalators are:

> Citation Number 2, Item 2a, instance (b): an escalator had been dropped from level 5 to level 4, with only caution tape used as a warning of the drop.

> Citation Number 2, Item 2a, instance (d): the failure to provide barricade and warning signs when an elevator shaft was "cut."

[8]The citations at issue relating to fall hazards are:

> Citation Number 2, Item 2b, instance (a): failure to cover properly expansion joint openings in the floor on the second and third level.

> Citation Number 2, Item 2b, instance (b): floor hole into which an employee, Charles Wallace, fell without being

6

testified that despite injuries and repeated notifications to their supervisors about these dangers, BTC did not rectify the violations.

### C. The Health Case: Lead Exposure Activities

The Health Case allegations are divided into pre-implosion exposure and post-implosion exposure violations. Ultimately, the ALJ concluded that the Secretary had established that there were many OSH Act health violations, and concluded that BTC engaged in "willful violations includ[ing] failure to make an appropriate initial determination of lead exposure and to provide interim and other protections from excessive lead exposure." App. at 17. The ALJ, however, did not uphold all of the charges.[9]

#### 1. Pre-Implosion Exposure

The pre-implosion exposure to unacceptable lead levels stemmed from two activities. The first was the torch cutting of bolts from the steel legs of the stadium seats coated with lead based paint. Approximately four employees spent two to four eight-to-ten hour days engaged in this type of work.

---

> seriously injured. The hole was about 3 feet by 3 feet and was 15 to 20 feet above the ground below and was covered by a tin cover.
>
> Citation Number 2, Item 2b, instance (c): floor hole into which an employee, David Roberts, fell, and was injured seriously with torn tendons and deep bruises followed by surgery. At the time of the hearing Roberts still used a cane. The hole was 30 to 40 feet above the floor below, covered by a pile of concrete blocks.

[9]Certain of the charges not upheld were duplicative or involved conduct that was not willful.

There was a second pre-implosion exposure when BTC employees torch cut "notch-cuts" on lead-based painted structural steel beams. These cuts were necessary to ensure that there was a complete cave-in at the time of the implosion. Approximately four employees performed this task in ten-hour shifts for varying degrees of duration.

These activities caused several employees to complain to their supervisors about the lack of respirators; however, BTC did not supply safety equipment. Consequently, some employees resorted to wearing their own half-mask respirators, though these devices did not comport with the requirements of the OSH Act.

2. Post-Implosion Exposure

The post-implosion exposure stemmed from the process of cutting the remaining steel beams into smaller pieces in order to fit the debris into trucks. Although mechanical shears could be used to cut most of the steel, a number of the beams were too large for the shears and therefore needed to be cut with torches. This torch cutting began without protection from lead exposure on February 13, 2001, and extended into the night shift of February 14, 2001.

On February 21 and 22, OSHA and BTC concurrently engaged in air monitoring to assess the lead danger. Three employees were monitored over the course of two days, and, for the first time, were supplied with air respirators with face shields. The results of both OSHA's and BTC's testing revealed lead exposure significantly above the permissible levels. The "permissible exposure limit" is $50\mu g/m^3$ (calculated as an 8-hour time average), though the lead standard defines the "action level" of exposure at $30 \mu g/m^3$ (calculated as an 8-hour time weighted average). See 29 C.F.R. §§ 1926.62(b) and (c). The concurrent sampling revealed the following exposure levels:

| Date | Employee | OSHA Time Weighted Average (Time Sampled) | BTC Time Weighted Average (Time Sampled) |
| --- | --- | --- | --- |

8

| 2/21/2001 | Shawn Cramer | 36μg/m³ (321 min.) | 36μg/m³ (234 min.) |
|---|---|---|---|
| 2/21/2001 | Kevin Opfar | 259μg/m³ (323 min.) | 209μg/m³ (230 min.) |
| 2/21/2001 | Eric Yockey | 318.6μg/m³ (317 min.) | 975 μg/m³ |
| 2/22/2001 | Shawn Cramer | 37μg/m³ (458 min.) | 40 μg/m³ |
| 2/22/2001 | Kevin Opfar | 954.4μg/m³ (318 min.) | 2158 μg/m³ |
| 2/22/2001 | Eric Yockey | 615.1μg/m³ (464 min.) | 1453 μg/m³ |

See app. at 69.[10]  It was thus evident that BTC had been operating with insufficient safety precautions given the significant lead exposure risk.

### 3.  BTC's Efforts To Comply With The Lead Standard

The citations in the Health Case stem from BTC's failure to comply with the Standard, see 29 C.F.R. § 1926.62, which "applies to all construction work where an employee may be occupationally exposed to lead." Id.  Where employees may be exposed to lead, the employer is required to perform an "exposure assessment" to determine if any employee is exposed to lead "at or above the action level." Section 1926.62(d)(1)(i).  The action level is defined as "employee exposure, without regard to the use of respirators, to an airborne concentration of lead of 30 micrograms per cubic meter of air (30 μg/m³) calculated as an 8-hour time-weighted average." Section 1926.62(b).

---

[10]Shawn Cramer was a working foreman who served as fire watch for the employees engaged in burning tasks.  Though he was not overexposed on either day of the monitoring, he did not engage in burning work; however, his sampling results did indicate that he was exposed at more than the action level and half of the permissible exposure limit.

The employer calculates an "exposure assessment" through an "initial determination" in which covered employers "initially determine if any employee may be exposed at or above the initial action level." Section 1926.62(d)(1).[11] Section 1926.62(d)(3) sets forth the various methods by which an employer can perform an "initial determination." Section 1926.62(d)(3)(i) notes, with two exceptions, that "the employer shall monitor employee exposures and shall base initial determinations on the employee exposure monitoring results. . . ."

BTC, however, did not monitor the potential exposure to lead at the stadium to perform its "initial determination." Rather, BTC, aided by O'Rourke, relied on section 1926.62(d)(3)(iii), commonly referred to as the "historical data" method, which allows an employer to rely on monitoring results from a recent project involving "workplace conditions closely resembling the processes, type of material, control methods, work practices, and environmental conditions used and prevailing in the employer's current operations."

BTC utilized a lead assessment from its earlier National Starch and Chemical Company demolition project (hereinafter called the "National Starch report")[12] as the "historical data" for the stadium project, reasoning that the National Starch project "closely resembled" the stadium project. The National Starch project required BTC to demolish an old power house and drying facility inside a corn starch factory complex in Indianapolis, Indiana. The National Starch report showed exposures below the action level for workers torch cutting in that project. BTC concluded that it was not required to perform initial monitoring (or to take interim steps in lieu of monitoring) at the stadium because that project "closely resembled" that at National Starch. Accordingly, BTC deemed it necessary only to provide hand-washing facilities as protection against lead exposure. BTC does not claim that it provided any protection against lead exposure for

---

[11]The Standard also establishes a rebuttable presumption that certain tasks, including torch cutting materials with lead-based paint or coatings, result in exposures above the permissible action level. See 29 C.F.R. § 1926.62(d)(2)(i)(A).

[12]The report also was labeled the "Act report" because BTC hired ACT Environmental Services, Inc. to perform the exposure assessment of the National Starch demolition project. We call it the "National Starch report" for clarity purposes.

10

employees who were torch cutting lead based paint between January 4 and, at least, February 14. See petitioner's br. at 23; respondent's br. at 31.

BTC's management first expressed concern over lead exposure on February 13, and on February 14, 2001, BTC provided half-mask respirators but not air-supplied respirators to affected employees. It was not until February 16, a day after BTC attempted to deny entry to the OSHA hygienists, that the first site specific lead compliance program was drafted. The "plan" stated that BTC used the National Starch report to determine that employees would not be exposed to lead, and that there would be air monitoring.[13]

As we already have noted, the results from monitoring by both OSHA and BTC revealed that there were lead exposure levels substantially greater than the action level allowed. On February 20, 2001, O'Rourke, in response to the sampling results, modified the compliance program to require additional measures. The ALJ noted that, "[e]ven the final revised plan did not provide sufficient detail concerning the engineering controls to be used, technology to be used, air monitoring, or a schedule for compliance." App. at 96.

## II. JURISDICTION

---

[13]The ALJ noted the deficiencies of the plan:

> Specifically, it lacked: (1) a description of each activity in which lead was emitted; (2) a specific means to achieve compliance; (3) a report of the technology considered in meeting the [permissible exposure limit]; (4) air monitoring data; (5) a detailed schedule for implementation of the program; (6) an administrative control schedule; and (7) a description of arraignments made among contractors to inform affected employees of potential exposure to lead.

App. at 96.

As we have indicated, the parties tried the case before an ALJ who upheld most of the citations. BTC then filed a petition for discretionary review with the Occupation Safety and Health Review Commission, which, on February 27, 2004, denied review and entered a final order. BTC then filed a petition for review with this court on April 20, 2004.

The Commission had jurisdiction to adjudicate this matter pursuant to section 10(c) of the OSH Act, 29 U.S.C. § 659(c). We exercise jurisdiction over this matter pursuant to section 11(a) of the OSH Act, 29 U.S.C. § 660(a), which gives the court of appeals of the circuit in which the violation occurred jurisdiction to hear an appeal from a final order of the Commission with respect to the violation. See E & R Erectors, Inc. v. Sec'y of Labor, 107 F.3d 157, 160 (3d Cir. 1997).

## III. DISCUSSION

### A. Standard of Review

We will affirm the Secretary's interpretation of OSHA standards if it is reasonable. See Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150-52, 111 S.Ct. 1171, 1176 (1991). We must uphold the Commission's factual findings if they are supported by substantial evidence in the record as a whole. See 29 U.S.C. § 660(a); D. Harris Masonry Contracting, Inc. v. Dole, 876 F.2d 343, 344 (3d Cir. 1989). We may set aside legal conclusions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Atlantic & Gulf Stevedores v. Occupational Safety & Health Review Comm'n, 534 F.2d 541, 547 (3d Cir. 1976). In addition, we must defer to an agency's reasonable interpretation of an ambiguous administrative statute. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-46, 104 S.Ct. 2778, 2781-84 (1984).

### B. The Health Case

1. BTC's Use of "Historical Data" To Make an "Initial Determination"

The first issue we address is "whether it was appropriate for BTC to use 'historical data' to make an 'initial determination' that potential employee exposure to lead was below the 'action level' when torch burning operations occurred during the pre-implosion and post-implosion phases of the demolition of the stadium." Petitioner's br. at 10. The ALJ determined that BTC's use of the National Starch report's "historical data" was not appropriate for making an initial determination with respect to employee exposure to lead during the stadium demolition.

The Standard defining the appropriate procedures for performing an "initial determination" reads, in relevant part:

> (i) Except as provided under paragraphs (d)(3)(iii) and (d)(3)(iv) of this section the employer shall monitor employee exposures and shall base initial determinations on the employee exposure monitoring results. . . .
>
> . . . .
>
> (iii) Where the employer has previously monitored for lead exposures, and the data were obtained within the past 12 months during work operations conducted under workplace conditions <u>closely resembling</u> the processes, type of material, control methods, work practices, and environmental conditions used and prevailing in the employer's current operations, the employer may rely on such earlier monitoring results to satisfy the requirements of paragraphs (d)(3)(i) and (d)(6) of this section if the sampling and analytical methods meet the accuracy and confidence levels of paragraph (d)(10) of this section.

29 C.F.R. § 1926.62(d)(3) (emphasis added).

The ALJ first addressed the issue of whether the "historical

13

data" method represents an exception to monitoring, which is treated as the preferred means of making an initial assessment, or, as BTC contends, whether the "historical data" method is another valid, and equally accepted, method that an employer can use to make the initial determination with respect to lead exposure.  The ALJ rejected BTC's contention and concluded that the "historical data" method of making an initial assessment was an exception to the monitoring method.  Because she deemed the use of "historical data" to be an "exception" to the preferred means to make an initial assessment, the ALJ placed the burden on BTC to prove that its use of the "historical data" was appropriate.  In reaching her conclusion, the ALJ noted that, "[i]n general, exceptions in remedial legislation, such as the OSH Act, must be narrowly construed."  App. at 71.

The ALJ continued by noting that the phrase "closely resembling," contained within the "historical data" exception, was not defined in the Standard.  BTC offered a broad interpretation of the phrase which relied on comparing "the processes,"[14] "the type of material,"[15] "the control methods,"[16] "the work practices,"[17] and "the environmental conditions"[18] involved in the two projects.  Id. at 74.  In addition, BTC denied that a comparison of materials between the two projects required a gathering and testing of bulk paint samples.

The Secretary disagreed with BTC's broad interpretation of the phrase "closely resembling."  She noted that the "similarities suggested by BTC [were] too superficial to meet an exception to a standard intended to protect employees generating airborne lead."  Id.

---

[14]Both projects required burning on structural steel in the open air.

[15]Both projects involved cutting or burning lead painted structural steel.

[16]Neither project required any control methods, other than "normal [personal protective equipment], including [a] 3 foot Torch." App. at 74.

[17]Both projects required notch cuts to be made on the steel during 10 hour shifts.

[18]Both projects required performing the work in the open air during cold weather.

14

The Secretary also asserted that BTC simply did not have enough information to compare the two projects. In particular, she observed that BTC had not taken bulk samples of the paint, nor made any other attempts to secure data to make comparisons between the two sites.

The ALJ concluded that the term "closely resembling" was ambiguous. Thus, she looked to the Standard's preamble to glean the Secretary's intent for including the "historical data" exception. The ALJ found that the stated purpose of the exception was for those situations where:

> an employer on a construction site conducted exposure monitoring for previous job(s) and the current job was 'substantially similar' to the old one(s), the previous 'historical data' could substitute for new monitoring. So that the old data could be 'reasonably assumed' to be representative for lead exposures on the new site, the historical measurements had to be obtained 'under conditions which in all relevant and significant respects are essentially the same as the current project.'

Id. at 75 (quoting Lead Exposure in Construction, 58 Fed. Reg. 26599 (1993) (emphasis added by ALJ)).

The ALJ held that, while the exception may not require an "absolute identity" between projects, a case-by-case factual analysis was necessary. The ALJ concluded that, "informed by the synonyms for 'closely resembling' in the preamble and the stated purpose of the exception, it is determined that BTC's reliance on the historical data was incorrect." Id. The ALJ relied heavily on the fact that BTC had not attempted to determine the lead content of the stadium, and thus never bothered to discover "one component of what is necessarily a two-part comparison." Id. She therefore concluded that, "BTC could not know whether the lead-containing material at the two projects was 'substantially similar' or 'essentially the same.'"[19] Id. While bulk sampling would not always be necessary, the ALJ determined that it

_____

[19]The ALJ noted that the characteristics of lead paint could not be assumed to be the same.

15

was in this case.[20]  The ALJ concluded that BTC's reliance on the historical data exception, therefore, was not reasonable.

BTC urges that the ALJ erroneously concluded that the use of historical data to make an initial lead assessment constitutes an exception to monitoring, and thereby incorrectly elevated monitoring to the preferred method of performing an initial determination.  BTC contends that the use of historical data is not an "exception," but is another acceptable, and equally viable method by which the employer may make the initial determination.  BTC continues by contending that this "erroneous legal determination had significant negative consequences for BTC because it permitted the ALJ to erroneously shift the burden of proof on that issue from the Secretary to BTC."  Petitioner's br. at 24.  BTC also asserts that because the ALJ deemed the use of "historical data" an exception to the monitoring requirement, she erroneously narrowed the scope of what could be deemed a permissible comparison site.

We reject BTC's contentions.  The Commission and this court must accept the Secretary's interpretation of the Standard if it is reasonable.  See Martin, 499 U.S. at 150-52, 111 S.Ct. at 1175-76 (1991). The Secretary's interpretation of the Standard, deeming the historical data exception as just that, i.e. an exception to the monitoring mandate, clearly is reasonable.  First, the plain language of the Standard identifies the "historical data method" as an exception: "Except as provided under paragraphs (d)(3)(iii) . . . ." 29 C.F.R. § 1926.62(d)(3) (emphasis added); see also 29 C.F.R. § 1926.62, Appendix B, II (explaining that the "initial determination requires [the] employer to monitor workers' exposure unless he or she has objective data which can demonstrate conclusively that no employee will be exposed to lead in excess of the action level") (emphasis added).  Second, Congress intended in the OSH Act to protect employees from the disastrous effects of lead exposure.  The statute and regulations repeatedly demonstrate a preference for the protection of employees.  See, e.g., 29 C.F.R. § 1926.62(d)(2) (establishing presumption that certain tasks, including torch cutting materials with lead based paint or coating, results in exposures above the action level).  It was clearly reasonable for the Secretary to apply the statute and regulations in a manner so that the acquisition of actual data on the potential exposure to lead through monitoring on the current

---

[20]The ALJ also noted that the methods, work practices, and environmental factors differed to varying degrees as well.

project, rather than reliance on data from an entirely separate project, constitutes the preferred method of performing an initial assessment.

Because the use of historical data represents an exception to the monitoring requirement, and BTC relied on this exception, the ALJ correctly placed the burden on BTC to demonstrate that it properly utilized the National Starch report for making an initial determination with respect to the stadium. Clearly, the ALJ also was correct in her holding that BTC could not meet this burden and prove the appropriateness of its reliance on the historical data. The workplace conditions at the National Starch structure and the stadium were so dissimilar that they could not be deemed to "closely resemble" one another under any meaningful construction of that phrase. The ALJ, at length, documented the differences between the two sites with respect to environmental conditions and work practices.

While these differences are important factors that show dissimilarities, the major focus must rest on a comparison of potential lead exposure. As the results of the sampling revealed, there were wide inconsistencies between the conditions at the National Starch project and those at the stadium predicated on the differences between the actual level of lead exposure at the sites. To highlight one glaring example, two bulk samples taken from the painted steel beams at the National Starch site revealed 0.095 and 0.484 percent lead content. At the stadium, the bulk samples of the seats ranged from 3.0 to 8.0 percent lead content, and the steel beams ranged from 2.2 to 43 percent lead content. It is clear that conditions involving such divergent amounts of lead cannot be deemed to "closely resemble" one another under any coherent definition of that phrase.

The ALJ therefore correctly held that BTC's use of the National Starch report as "historical data" to make the "initial determination" that potential employee exposure to lead at the stadium was below the "action level" was inappropriate.

2. The ALJ's Determination That BTC Willfully
   Violated the Standard

The next issue raised is whether there was substantial evidence in the record supporting the ALJ's determination that BTC willfully

17

violated the Standard. The ALJ concluded that BTC's violations were "willful" because "[t]he record establishe[d] that BTC had a heightened awareness of the cited requirements of the lead standard yet chose to disregard them." App. at 108. She found that BTC had heightened awareness of the presence of lead based on its experience with comparable projects in which it dealt with lead and its having held itself out to the public as an expert on lead and applicable OSHA standards. Moreover, the ALJ indicated that "it is well known that torch burning and cutting steel can generate high levels of airborne lead." Id. at 109-10.

In addition, the ALJ found that the Secretary independently also could have established a willful violation by demonstrating "plain indifference" to employee safety. The ALJ documented at length the instances in which BTC ignored or deflected questions by its employees related to inquiries about lead, and noted several occasions in which BTC denied its employees' requests for safety equipment. App. at 111 (citing Fluor Daniel, Nos. 96-1729 and 96-1730, 19 O.S.H. Cas. (BNA) 1529 (2001), 2001 WL 1117965 (O.S.H.R.C.), aff'd sub nom., Fluor Daniel v. Occupational Safety & Health Comm'n, 295 F.3d 1232 (11th Cir. 2002) (employer who consciously chose to deprive employees of emergency respirators committed willful violation)).

The ALJ additionally rejected BTC's argument that it had a "reasonable reliance" defense to the allegations of "willfulness." BTC asserted that it could not have acted "willfully" because it merely was relying on and following the advice that O'Rourke, its safety consultant, gave it. The ALJ concluded that "[t]he fact that BTC hired the small safety and health consultant company does not relieve it of responsibility for conditions it knew were unsafe. BTC's attempt to distance itself from the lead expertise it claimed in other contexts was unconvincing." App. at 110.

"Although the [OSH] Act does not define the term 'willful,' courts have unanimously held that a willful violation of the [OSH] Act constitutes 'an act done voluntarily with either an intentional disregard of, or plain indifference to, the [OSH] Act's requirements.'" Ensign-Bickford Co. v. Occupational Safety & Health Review Comm'n, 717 F.2d 1419, 1422 (D.C. Cir. 1983) (quoting Cedar Constr. Co. v. Occupational Safety & Health Review Comm'n, 587 F.2d 1303, 1305 (D.C. Cir.1978)); see also Ensign-Bickford, 717 F.2d at 1422 (citing nine cases from courts of appeals embracing the

18

"intentional disregard or plain indifference" standard); <u>Universal Auto Radiator Mfg. Co. v. Marshall</u>, 631 F.2d 20, 23 (3d Cir. 1980). Multiple violations of the lead standard can be deemed willful where the employer manifested both intentional disregard for the Standard and plain indifference to employee safety. <u>See</u> <u>Interstate Lead Co.</u>, Nos. 89-2088P and 89-3296, 15 O.S.H. Cas. (BNA) 1989 (1992), 1992 WL 277025, at *29-32 (O.S.H.R.C.A.L.J.). We will uphold the Commission's factual findings if they are supported by substantial evidence in the record as a whole; whether a violation was willful is a question of fact. <u>See</u> <u>Universal Auto</u>, 631 F.3d at 23.

BTC asserts that there is not substantial evidence in the record to support the findings that its violations were "willful." BTC raises three arguments to lend credence to its purported lack of willfulness: (1) it did not engage in willful conduct because it reasonably relied on O'Rourke's expert advice pertaining to lead hazard; (2) the ALJ did not amply factor into her analysis the confusion rendered by the Standard's ambiguity and incompleteness, resulting in a violation that was more a misunderstanding than a willful violation; and (3) after it discovered that it erroneously had relied on the National Starch report it took steps to remedy the problem.

BTC's attempt to claim that its violations were not willful are unconvincing. First, the ALJ correctly denied BTC's attempt to shift responsibility for the violations to O'Rourke. The Commission previously had held that a company cannot evade its safety and health responsibilities to its workers simply by contracting away the responsibilities mandated under the OSH Act. <u>See</u> <u>Well Solutions, Inc.</u>, No. 91-340, 17 O.S.H. Cas. (BNA) 1211, 1214 (1995), 1995 WL 242595, at *3 (O.S.H.R.C.) ("[T]he [OSH] Act places ultimate responsibility for compliance with its requirements on the employer, who cannot contract away those duties to another party.")[21] As the

---

[21]BTC relies heavily on <u>Sasser Electric & Manufacturing Co.</u>, No. 82-178, 11 O.S.H. Cas. (BNA) 2113 (1984), 1984 WL 34886 (O.S.H.R.C.). In <u>Sasser</u>, a crane operator accidentally swung the boom of the crane into nearby power lines. The Commission held that the general contractor reasonably had relied on the safety efforts of the crane company with which it subcontracted, because: (1) the cited hazard dealt with the operation of a crane and fell within the expertise of the subcontractor; (2) the subcontractor had exclusive control over the hazard; (3) the general contractor had warned the subcontractor of the closeness of the power lines; and (4) considering that the subcontractor

ALJ noted, BTC has experience in the undertaking of demolition projects involving lead hazards. In the circumstances, its claims of naivete as to the dangers of its course of conduct, based on the suggestions of a small consulting firm, are dubious at best. App. at 110. Considering that OSHA employees ascertained BTC's safety failures by watching the local nightly news, its claims of ignorance are unconvincing.

Furthermore, BTC committed pre-implosion violations before it ever "relied" on O'Rourke's advice. Though BTC could not pinpoint the exact date of its decision to rely on the National Starch report, Timothy O'Rourke testified that the date was around January 20, 2001. The ALJ noted that "[t]hat date would have been <u>after</u> employees burned painted structural steel for about 10 days . . . ." <u>Id</u>. at 110 (emphasis in original). Additionally, BTC informed O'Rourke that it would not be doing pre-implosion cutting. O'Rourke concluded, partially on the basis of this information, that the National Starch report would be a valid basis for use of the "historical data" exception. In the circumstances, we are satisfied that BTC cannot find a safe harbor in an erroneous assessment of the lead dangers when its own incomplete information and false diagnosis led to the misuse of the historical data.

BTC next argues that its failings were not "willful," but rather stemmed from the ambiguity and incompleteness in the regulations. In an attempt to demonstrate this point, BTC cites 29 C.F.R. § 1926.62(d)(3)(iii) (emphasis added):

---

had performed the same work previously without incident, there was no reason for the general contractor to have foreseen that the crane operator would have swung the boom into the power lines. <u>Sasser</u>, 1984 WL 34886, at *3.

This case is plainly distinguishable from <u>Sasser</u>. BTC is claiming that it contracted away its responsibility with respect to OSHA requirements by hiring an environmental and safety consulting firm. But, unlike the situation in <u>Sasser</u>, BTC's employees still were performing the labor, and BTC as a company operated the equipment significant in the context of this case. This situation also is different from that in <u>Sasser</u> because in that case the general contractor, by reason of its lack of expertise, contracted out a particular task to an independent contractor who was expected to perform that discrete function fully.

20

(iii) Where the employer has previously monitored for lead exposures, and the data were obtained within the past 12 months during work operations conducted under workplace conditions closely resembling the processes, type of material, control methods, work practices, and environmental conditions used and prevailing in the employer's current operations, the employer may rely on such earlier monitoring results to satisfy the requirements of paragraphs (d)(3)(i) and (d)(6) of this section if the sampling and analytical methods meet the accuracy and confidence levels of paragraph (d)(10) of this section.

BTC contends that section 1926.62(d)(3)(iii) is ambiguous because subparagraph (d)(10), to which the section refers, does not exist. The ALJ noted this drafting peccadillo, and stated, "[t]he intended reference is to subparagraph (d)(9)." App. at 72 n.14. Subparagraph (d)(9) reads:

(9) Accuracy of measurement. The employer shall use a method of monitoring and analysis which has an accuracy (to a confidence level of 95%) of not less than plus or minus 25 percent for airborne concentrations of lead equal to or greater than 30MUg/m3.

BTC argues that the ALJ's finding of willfulness was erroneous because, "nowhere in her decision does she take into account the potential for mistake the ambiguity and incompleteness of the standard would create for a layperson." Petitioner's br. at 33. BTC continues by arguing that "willfulness should not be found where the standard is complex and not perfectly clear and a violation resulted in negligence and misunderstanding rather than intentional disregard or plain indifference." Id. at 34.

We reject BTC's contention because it should have been

21

obvious to it that subparagraph (d)(10) could not relate to "accuracy and confidence levels," or indeed anything else, as the subparagraph did not even exist. Thus, it should have been evident that section 1926.62(d)(3)(iii) was referring to the sequentially numbered subparagraph (d)(9) as it is labeled "Accuracy of Measurement." BTC's argument is essentially that, upon reaching this drafting error, such "confusion" befell on it that its decision not to provide substantive safety precautions to protect against lead exposure could not be deemed willful. But BTC is an experienced company, and we reject its contention that its confusion over a misplaced, tangentially relevant guideline can excuse it from performing its safety obligations. Thus, the ALJ correctly rejected this contention.

Additionally, we reject BTC's attempt to hold itself out as a "layperson" faced with a complex statute it could not understand. Its own management, including foremen, had extensive experience navigating OSHA regulations and handling demolition involving lead based paint. BTC's decision to ignore the regulations because of a sense of "confusion" is simply not believable.

Finally, BTC claims that its violations were not willful, as witnessed by the steps it undertook to alleviate exposure after the level of lead was discovered. The ALJ correctly rejected this claim as well. BTC, in fact, did not take steps to alleviate the valid concerns of its employees during the pre-implosion phase of the demolition. Moreover, the steps it took in response to the OSHA inspection were inadequate, and continued to violate unambiguous standards of the applicable OSH Act provisions and regulations. For example, rather than suspend burning or prospectively comply with the OSH Act's mandates, BTC gave its employees half-mask respirators, not the required mandated air-supplied respirators. Additionally, BTC did not (1) advise its employees in writing of its "negative determination"; (2) failed to advise employees of their blood test results; (3) failed to use known engineering controls to reduce exposures; and (4) failed even to post a warning sign. There clearly was substantial evidence in the record supporting the ALJ's determination that BTC willfully violated OSHA's lead standards.

C. The Safety Case

1. The "Cutting" of Escalators

BTC next asserts that the ALJ erred in holding that "dropping" the escalators without proper safety measures violated 29 C.F.R. § 1926.850(h). The violation at issue arose when BTC "cut" escalators, i.e., "when the top of the escalator was released, on some occasions it would fall to the floor unexpectedly." Petitioner's br. at 47. The regulations at issue provide:

> (h) When debris is dropped through holes in the floor without the use of chutes, the area onto which the material is dropped shall be completely enclosed with barricades not less than 42 inches high and not less than 6 feet back from the projected edge of the opening above. Signs, warning of the hazard of falling materials, shall be posted at each level. Removal shall not be permitted in this lower area until debris handling ceases above.

> (i) All floor openings, not used as material drops, shall be covered over with material substantial enough to support the weight of any load which may be imposed. Such material shall be properly secured to prevent its accidental movement.

29 C.F.R. § 1926.850 (h), (i).

BTC asserts that the ALJ erred in determining that subparagraph (h) was applicable to the escalator drops, because the escalators were not "debris . . . dropped through holes in the floor without the use of chutes." See petitioner's br. at 47. BTC's argument is simply that there were no "holes," because despite the potential crashing of escalators to the surfaces below, it was the removal of the escalators that "created" the holes.[22]

_____

[22]BTC contends that "[t]here was no 'shaft' where heavy machinery fell into. To the contrary, the escalator top, once unhinged, merely dropped to the level where the foot of the escalator rested." Petitioner's br. at 49 (emphasis added).

23

BTC's contention that the ALJ inappropriately applied the regulation to the falling escalators is simply erroneous. The ALJ was correct in her assessment that "whether or not BTC specifically created the escalator and elevator holes for removal of debris is irrelevant. BTC specifically used the holes for removal of debris." App. at 56 (emphasis in original).[23] It clearly is reasonable to interpret the regulation so as to recognize that an escalator falling only one floor, even through the hole in which it originally stood, creates the precise hazard against which the standard required BTC to protect. The fact that the hole was not "preexisting" is immaterial. The Commission's and Secretary's interpretation of section 1926.850(h) "sensibly conforms to the words and purpose of the standard" and therefore we must uphold it. See Martin, 499 U.S. at 151, 111 S.Ct. at 1176.

2. The ALJ's Determination That BTC Willfully
Violated OSHA Standards Relating To Fall
Hazards and the Hazards Relating To Falling Debris

BTC also contends that there is not substantial evidence in the record as a whole to support the ALJ's determination that certain violations relating to fall hazards and hazards relating to falling debris were willful. The ALJ concluded that in light of BTC's experience with and knowledge of OSHA requirements, as well as evidence demonstrating BTC's knowledge of these hazards (demonstrated by its own employees' complaints), BTC acted willfully with respect to both the fall hazards, as well as the hazards from falling debris. BTC argues that the ALJ's determination that these violations were willful was unfounded.

We will uphold the Commission's factual findings if they are supported by substantial evidence in the record as a whole; whether a violation was willful is a question of fact. See Universal Auto, 631 F.3d at 23. Here there is substantial evidence in the record demonstrating that BTC was aware of the violations and safety hazards, but chose not to rectify the problems though the measures mandated under the OSH Act. Thus, substantial evidence in the record as a whole supported the ALJ's conclusion that BTC willfully

_____

[23]We do not discuss separately the elevator situation, but we conclude that the ALJ did not err in her findings with respect to it.

24

violated the OSH Act.

D. Expert Testimony

The final issue BTC raises is that "[t]he ALJ allowed the Secretary to proffer expert testimony in derogation of Rule 26 of the Rules of Civil Procedure." Petitioner's br. at 25. The OSH Act provides that the Federal Rules of Civil Procedure apply to actions before the Commission unless the Commission has adopted an applicable procedural rule. 29 U.S.C. § 661(g); 29 C.F.R. § 2200.2(b). While the Commission has adopted procedural rules governing discovery, these rules do not address expert testimony specifically. See 29 C.F.R. § 2200.51-2200.57.

On January 28, 2002, the ALJ issued an order setting the date of the hearing for March 20, 2002. Discovery was set to end ten days prior to the start of that hearing. During a February 5, 2002 teleconference, the ALJ rescheduled the hearing for June 3, 2002. At that time the ALJ directed the parties to comply with Fed. R. Civ. P. 26.

Fed. R. Civ. P. 26(a)(2) requires parties to identify their proposed experts, and mandates additional requirements for experts who are "retained or specially employed to provide expert testimony." The rule requires that the party retaining the expert, "in the absence of other directions from the court or stipulation by the parties," provide a report prepared by the expert explaining his proposed testimony and provide other personal background information. Fed. R. Civ. P. 26(a)(2)(B). The default time for these disclosures is 90 days prior to the trial date. Fed. R. Civ. P. 26(a)(2)(C).

It is without dispute that the Secretary did not comply with the 90-day requirement.[24] See petitioner's br. at 26; respondent's br. at

_____

[24]The Secretary contends that she was not required to abide by the 90-day disclosure requirement because the January 28, 2002 scheduling order set the "discovery deadline" for ten days before trial. See respondent's br. at 46-47. The Secretary argues that the ten-day deadline represents "other directions from the court" and therefore the 90-day period was inapplicable. BTC contends that "no such argument was advanced at trial and, as such, was not preserved for appeal."

25

47. On these grounds, BTC challenges the ALJ's decision to allow the testimony of John Cignatta, Raymond Feldman, Dr. Cortinovis, Compliance Officer Jan Oleszeweski, and Assistant Area Director Edward Selker.

BTC's claims, however, are without merit as it does not demonstrate that the ALJ's decision to allow the testimony in question prejudiced it. Cignatta and Cortinovis, the witnesses with whom that BTC takes the most umbrage, testified on a number of points, none of which was in contention. BTC never disputed the fact that overexposure to lead poses a "serious" hazard, nor was their testimony essential to establish the violations at issue. Indeed, BTC's own testing revealed unacceptably high lead exposure at the stadium and, accordingly, its erroneous reliance on the National Starch report as historical data.

The Secretary offered the testimony of the other witnesses BTC challenged to rebut BTC's expected challenges to the reliability of OSHA's monitoring results. This testimony could not have prejudiced BTC as it never argued that weather or recalibration irregularities significantly impacted OSHA's test results; and again, BTC's own testing provided ample evidence of the lead exposure violations. Given BTC's inability to demonstrate that either the procedures permitting the introduction of the testimony in question or the testimony itself prejudiced it, we reject its contentions relating to expert testimony.

## IV. CONCLUSION

After a complete examination of this matter we are satisfied that the points BTC has raised lack sufficient merit and thus we will deny its petition for review of the February 27, 2004 order.

———

Petitioner's reply br. at 10. We need not address this point as BTC does not demonstrate how the procedure permitting the introduction of the testimony at issue prejudiced it.