45 A.3d 965

KENNETH VAN DUNK, SR. AND DEBORAH VAN DUNK, PLAINTIFFS–RESPONDENTS, v. RECKSON ASSOCIATES REALTY CORPORATION; RECKSON CONSTRUCTION AND DEVELOPMENT LLC; PAULUS, SOKOLOWSKI & FLEMING, INC.; AND JOSEPH FLEMING, P.E., DEFENDANTS, AND JAMES CONSTRUCTION COMPANY, INC., DEFENDANT–APPELLANT.

Argued October 12, 2011—Decided June 26, 2012.

*George J. Kenny* argued the cause for appellant (*Connell Foley*, attorneys).

*Glenn M. Gerlanc* argued the cause for respondents (*Parisi & Gerlanc*, attorneys; *Mr. Gerlanc* and *Steven M. Davis*, on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

New Jersey's Workers' Compensation Act (the Act), *N.J.S.A.* 34:15–1 to –128.5, provides a prompt and efficient remedy for an employee's claim against an employer for a workplace injury. The Legislature made the statutory workers' compensation remedy its preferred mechanism for providing compensation to injured workers. The Act's remedy is exclusive, except for injuries that result from an employer's "intentional wrong"; for those, an injured employee is permitted to maintain a common-law tort action against the employer. *N.J.S.A.* 34:15–8. A series of cases from this Court have addressed what constitutes an intentional wrong that permits relief from the statutory bar against a common-law action for a workplace injury. As the case law demonstrates, an employer's deliberate intent to injure is not the sine qua non; instead a substantial certainty that injury or death will result must be demonstrated. This appeal tests the limits of that formidable standard.

Plaintiff Kenneth Van Dunk and his wife filed this suit in the Law Division after he suffered serious injuries in a trench collapse

at a construction site workplace.[1] Following discovery, the trial court granted summary judgment to the employer defendants. Based on its assessment of the totality of circumstances, the court concluded that plaintiff did not demonstrate an intentional wrong within the meaning of the Act, notwithstanding that the employer was issued a federal Occupational Safety and Health Administration (OSHA) "willful violation" citation as a result of the incident. The Appellate Division reversed the trial court's grant of summary judgment to the employer, and returned the matter to the trial court. *Van Dunk v. Reckson Assocs. Realty Corp.*, 415 *N.J.Super.* 490, 505, 2 *A.*3d 456 (2010). We granted the employer defendant's petition for certification seeking review of that judgment. 205 *N.J.* 81, 12 *A.*3d 212 (2011).

No doubt, the circumstances in this matter are tragic. Although the proofs plaintiff advances could support a finding of gross negligence, that finding is insufficient to circumvent the statutory bar and maintain an action against plaintiff's employer. Based on the strong legislative preference for the workers' compensation remedy and an intentional-wrong standard that even an employer's recklessness and gross negligence fails to satisfy, we hold that this matter falls short of demonstrating that an intentional wrong creating substantial certainty of bodily injury or death occurred. The judgment of the Appellate Division is reversed. The workers' compensation statutory bar against a common-law tort action prevails and precludes this action.

I.

In August 2004, when his workplace injuries occurred, Van Dunk was working for defendant James Construction Company, Inc. (James) as a union-provided "as-needed" laborer on a construction project at Giralda Farms in the Township of Chatham and Borough of Madison. Defendants Reckson Associates Com-

---

[1] Van Dunk and his wife are both plaintiffs in the instant matter, but for the purposes of this opinion, we refer to them singly as "plaintiff."

pany, Inc. and Reckson Construction, LLC (together Reckson) had contracted with James for James to perform site-preparation work. James, in turn, appointed Glenn Key as the project superintendent. Key also served as the OSHA-required on-site "competent person" for the project as of August 1, 2004.[2] Prior to this workplace incident, Key had been an employee of James for thirty-two years and had experience as a previous project superintendent. For the Giralda Farms project, he reported directly to James's president, J.D. Potash, and was responsible for planning and executing the construction work and for meeting budgets and deadlines.

On August 10, 2004, at the Giralda Farms construction site, James was excavating a trench to relocate a dewatering sump in a retention pond. Prior to that date, the project had been plagued by thunderstorms and heavy rain that had required work to be redone, without additional compensation to James. Rain was expected again later that day; as a result, Potash and Key sought to complete the sump relocation before the rain arrived. The sump relocation involved the following steps: digging a sloped trench; laying down first a filter fabric and then a layer of stone; placing a pipe on the stone; placing more stone on the sides and top of the pipe; and then wrapping additional filter fabric around the stone. As the trench excavation continued and its slope reached a depth of greater than five feet, Van Dunk and other workers began laying down the filter fabric from locations outside the trench. Eventually, the deepest part of the trench reached a depth of eighteen to twenty feet.

---

[2] OSHA regulations define a "competent person" as "one who is capable of identifying existing and predictable hazards in the surroundings, or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has authorization to take prompt corrective measures to eliminate them." 29 C.F.R. § 1926.650(b). James had in place a formal Safety Program that required the use of protective systems for trenches and the presence of a similarly defined "competent person."

OSHA safety regulations mandate that workers cannot enter a trench that is deeper than five feet if protective systems are not in place. 29 *C.F.R.* § 1926.652(a). A protective system is defined as "a method of protecting employees from cave-ins, from material that could fall or roll from an excavation face or into an excavation, or from the collapse of adjacent structures." 29 *C.F.R.* § 1926.650(b). James's Safety Program similarly requires use of protective systems to guard against cave-ins. Proper sloping and use of trench boxes are common protective systems, but for various reasons, Key determined that OSHA-compliant sloping could not be utilized at the trench's location, and a trench box was not employed.

Key and his workers experienced difficulty when laying down the filter fabric from their locations outside the trench. Despite their efforts, the fabric would not lay flat. It became tangled and a crease developed. Van Dunk volunteered to go into the trench to straighten the filter fabric, but Key told him not to do so because of the possible risks attributable to the ground conditions.[3] However, as problems persisted with laying the filter fabric, in what Key later described as a moment of "frustration" he told[4] Van Dunk to go in and straighten the fabric. Van Dunk went into the trench, walked to the deeper end, and began adjusting the fabric. He was in the trench for less than five minutes when a loud noise was heard and a trench wall caved in, burying Van Dunk to his chest. He sustained multiple serious

---

[3] As Key later explained, several risk factors for trench collapse were present. When deposed, Key stated that he observed some moisture present in the soil, which indicated moisture seepage. He also noticed cracking in the dirt along a bank of the trench. In addition, an excavator was being used in the excavation and he was aware that vibrations from excavating equipment are a risk factor in trench collapse.

[4] At his deposition, Key testified that he could not recall whether Van Dunk volunteered a second time to go into the trench. We review this summary judgment record in the light most favorable to the non-moving party. *Davis v. Devereux Found.*, 209 *N.J.* 269, 286, 37 *A.*3d 469 (2012) (citing *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995)).

injuries. He was rescued by coworkers who immediately responded to help him, some of whom jumped in to dig him out, and by police and emergency personnel.

OSHA investigators also arrived on the scene that day to investigate the incident and to interview Key. Their report states that the trench was approximately twenty feet in depth at its deepest point. Per OSHA standards, a registered professional engineer must design sloping or benching for a trench that is more than twenty feet deep. 29 *C.F.R.* § 1926 subpt. P, app. B, tbl.B–1. Key recognized that the trench's depth placed it "at the cusp" of requiring such special safety design treatment.

Importantly for purposes of this matter, Key readily acknowledged to OSHA that, as the competent person on-site, he knew the OSHA requirements and did not follow the standard for using a protective box for the trench's depth and category of soil type, notwithstanding that such a box was on-site. Also, there was no dispute that the sloping that was performed did not satisfy OSHA requirements; in his deposition Key explained that he lacked room to cut back the slopes more than had been accomplished. Those admissions led OSHA to find, in an investigative report, that the "non-compliance [with OSHA standards] was not an accident or negligence." As a result, the OSHA report concluded that James committed a willful violation and assessed a fine of $49,000. James did not contest the violation, but rather entered into negotiations with OSHA over the amount of the fine, ultimately agreeing to pay $24,500.

On August 8, 2006, Van Dunk and his wife filed the instant action against Reckson and James, among others, for damages arising out of his injuries from the trench collapse. The trial court granted defendants summary judgment because the court concluded that plaintiff failed to show that defendants' conduct met the intentional-wrong standard for overcoming the exclusivity of the workers' compensation remedy. *See N.J.S.A.* 34:15–8. During argument on the motion, the trial court summarized the standard that Van Dunk had to meet for the action to survive the

motion for summary judgment, explaining that an "[i]ntentional wrong has been interpreted to mean deliberate intention beyond gross negligence or similar concepts imputing instructive intent. Or willful and wanton failure of an employer to undertake known safety and health procedures for protection of its employees." The court concluded that the totality of the evidence, viewed favorably to plaintiff, did not demonstrate conduct that reached the level of an intentional wrong. The court reached that determination notwithstanding that "OSHA found the violation which could be evidence of negligence. We don't know whether it was an intentional disregard or plain indifference." [5] Also, taking note of the "hazardous nature of construction sites," the court found that what occurred was "just a function of industrial life" on a construction site:

> The plaintiff was out there. There would appear to be some frustration. Plaintiff jumps into the trench. The trench collapses five minutes later. In light of the totality of the circumstances, notwithstanding what occurred with the OSHA findings, this Court is satisfied that the plaintiff has not met [his] burden.

On appeal, the Appellate Division reversed, holding that plaintiff had produced sufficient evidence to show that defendants committed an intentional wrong, rendering plaintiff's suit free of the Act's exclusivity bar. *See Van Dunk, supra,* 415 *N.J.Super.* at 505, 2 *A.3d* 456. Recognizing that the case was "close," *id.* at 503, 2 *A.3d* 456, the panel addressed the two-pronged analysis for an intentional wrong and noted, with respect to defendant's conduct, that

> defendant had knowledge that allowing its employees to enter the trench without any safety device could lead to injury or death. Moreover, Key's acknowledgment that there was an accumulation of water in the bottom of the trench, indicating that

---

[5] The United States Circuit Courts of Appeal appear universally to embrace this definition of a "willful" violation. *See Ensign–Bickford Co. v. Occupational Safety & Health Review Comm'n,* 717 *F.*2d 1419, 1422 (D.C.Cir.1983) ("Although the Act does not define the term 'willful,' courts have unanimously held that a willful violation of the Act constitutes an 'act done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements.'" (citations omitted)); *Cedar Constr. Co. v. Occupational Health & Safety Review Comm'n,* 587 *F.*2d 1303, 1305 (D.C.Cir.1978) (collecting cases); *see also Bianchi Trison Corp. v. Chao,* 409 *F.*3d 196, 208 (3d Cir.2005) (noting that Third Circuit applies same standard).

moisture was weeping from the soil, that there was cracking on the bank of the trench, coupled with his knowledge that Type C soil, the kind of soil he was working with, was the least stable, all show, in the totality of the circumstances, that he knew the trench was unstable and that it could fail.

[*Id.* at 502–03, 2 *A.*3d 456.]

Although not finding the OSHA violation conclusive, the panel stated that the motion court "did not give significant credit to the OSHA citation or the fact that defendant could have made the trench more stable if it had used protective devices." *Id.* at 504, 2 *A.*3d 456. On the context prong of the analysis, which the panel recognized as presenting a purely legal question, the court took the view that "the Legislature would not have sanctioned the context within which this accident happened, or barred [plaintiff's] recovery from James." *Id.* at 505, 2 *A.*3d 456. Accordingly, the panel held that, upon examination of both prongs of the intentional-wrong analysis, the motion court had erred in granting summary judgment to defendants. *Ibid.*

James's petition for certification was granted on January 27, 2011. 205 *N.J.* 81, 12 *A.*3d 212 (2011).

## II.

Plaintiff maintains that he can overcome the Act's bar against independent tort recovery. Although he concedes that the issuance of an OSHA willful violation citation does not automatically establish an intentional wrong under the Act, he argues that many of the elements underlying a willful violation also support the finding of an intentional wrong. Plaintiff places great emphasis on Key's role as the on-site competent person, which placed Key in a unique position to assess the danger posed to plaintiff when he entered the trench. Based on a litany of risk factors, plaintiff asserts that Key knew that a trench collapse could happen, even if he did not know precisely when it would happen. Plaintiff further argues that Key and defendants were inappropriately motivated by their desire to keep costs down and finish the work quickly at the expense of employee safety.

According to plaintiff, Key's decision not to employ protective systems was a deliberate disregard of OSHA regulations that placed employees in a dangerous position. Thus, plaintiff asserts that his injury was more than an incidental risk of the job, pointing out that the Act is "not intended by the Legislature to protect and encourage the *knowing and purposeful disobedience of the law.*" He analogizes Key's decision not to utilize protective devices to circumstances in which the Court has found an intentional wrong where employers deliberately remove safety devices from equipment. Lastly, plaintiff contends that he does not need to demonstrate a pattern of past victims or close calls to establish an intentional wrong—a single event is sufficient.

Defendant James, on the other hand, argues that this Court's past decisions finding an intentional wrong in combination with an OSHA violation involved situations in which employers intentionally defrauded OSHA, which did not occur here. James further expresses concern that the Appellate Division's decision expands too far the ability to overcome the Act's exclusive remedy. According to defendant, the Appellate Division's decision will allow for injured parties to pursue independent tort actions based on the possibility of injury, rather than a near certainty. It also points out that a willful violation under OSHA should not serve as the basis for finding an intentional wrong—a willful violation can be predicated on an intentional disregard of OSHA regulations or plain indifference, and there is no way to know which of those standards relates to a particular willful violation.

### III.

Originally enacted in 1911 in response to perceived inequities in the administration of common-law remedies for employees' workplace injuries, the New Jersey Workers' Compensation Act accomplished a "historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they

suffered injuries by accident arising out of and in the course of employment." *Millison v. E.I. du Pont de Nemours & Co.*, 101 *N.J.* 161, 174, 501 *A.*2d 505 (1985); *see also Cruz v. Cent. Jersey Landscaping, Inc.*, 195 *N.J.* 33, 42, 947 *A.*2d 1228 (2008) (discussing Act's purposes); *Brunell v. Wildwood Crest Police Dep't*, 176 *N.J.* 225, 235, 822 *A.*2d 576 (2003) (describing Act as "important social legislation" that is intended to accomplish "swift recompense for injured employees"). When, by either express or implied agreement, the parties have accepted the provisions of the Act, the agreement operates as an employee's surrender of other forms of remedies. *N.J.S.A.* 34:15–8. In exchange for immunity from liability, the Act requires the employer to provide swift and certain payment, without regard to fault, to employees for workplace injuries. *Ibid.; see Millison, supra,* 101 *N.J.* at 174, 501 *A.*2d 505.

The Act's exclusivity can be overcome if the case satisfies the statutory exception for an intentional wrong. *N.J.S.A.* 34:15–8 provides that

[i]f an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, *except for intentional wrong.*

[(Emphasis added).]

In a series of cases beginning with *Millison,* this Court elucidated the modern understanding of the intentional-wrong exception to the Act's exclusive-remedy provision.

*Millison* presented the Court with the question of whether employees who suffered asbestos-related diseases as a result of their industrial jobs were limited to recovery only under the Act or whether such employees came within the intentional-wrong exception, entitling them to pursue a separate tort action against their employer. *Millison, supra,* 101 *N.J.* at 165, 501 *A.*2d 505. In their complaint, the plaintiffs alleged that their employer and company physicians committed two discrete wrongs. *Id.* at 168, 501 *A.*2d 505. First, the plaintiffs asserted that the defendants exposed employees to asbestos, knowing of its health hazards, and

that the defendants intentionally withheld from the plaintiffs information about those health risks. *Ibid.* Second, the plaintiffs asserted that the company and its physicians became aware, through yearly company physical examinations, that the individual plaintiffs had contracted serious illnesses from asbestos exposure. *Id.* at 168–69, 501 *A.*2d 505. According to the plaintiffs, the defendants hid that information from them, and returned them to their asbestos-ridden workplace rather than provide medical treatment to the already sickened plaintiff-workers. *Id.* at 169, 501 *A.*2d 505.

Prior to *Millison,* New Jersey case law had set a high bar for satisfying the intentional-wrong exception, requiring proof of "a deliberate intention to injure." *Id.* at 170, 501 *A.*2d 505 (collecting cases). The *Millison* Court recognized that, when determining "what level of risk-exposure is so egregious as to constitute an 'intentional wrong,' " the specific case before it demanded a careful balancing in recognition of the legislative intent behind the statute and an employee's interests, noting specifically that "the system of workers' compensation confronts head-on the unpleasant, even harsh, reality—but a reality nevertheless—that industry knowingly exposes workers to the risks of injury and disease." *Id.* at 177, 501 *A.*2d 505.

That said, the Court found the "deliberate intention to injure" standard to be too onerous and concluded that a more appropriate balance was struck through adoption of a "substantial certainty" standard. *Id.* at 178, 501 *A.*2d 505. The standard was delimited as follows:

> [T]he mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong.
>
> [*Id.* at 177, 501 *A.*2d 505 (quoting *Prosser and Keeton on Torts* § 8 at 36 (5th ed.1984)).]

The Court elaborated further on the newly established substantial-certainty standard, stating that it is not enough that "a known risk

later blossoms into reality." *Id.* at 178, 501 *A*.2d 505. Rather, the standard "demand[s] a virtual certainty." *Ibid.*

Going forward, *Millison* instructed courts, when assessing claims of intentional wrong, to engage in a two-step analysis. First, a court considers the "conduct prong," examining the employer's conduct in the setting of the particular case. *Id.* at 178–79, 501 *A*.2d 505. Second, a court analyzes the "context prong," considering whether "the resulting injury or disease, and the circumstances in which it is inflicted on the worker, [may] fairly be viewed as a fact of life of industrial employment," or whether it is "plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act." *Id.* at 179, 501 *A*.2d 505.

Applying that test to the facts in *Millison*, the Court held that the plaintiffs' claim of intentional exposure to asbestos in the workplace failed to meet the substantial-certainty threshold because such hazards were considered within the risks the Legislature contemplated in passing the Act. *Ibid.* However, the Court recognized the existence of a valid cause of action in respect of the plaintiffs' second claim, that their medical conditions were aggravated by the defendants' concealment of their illnesses. *Id.* at 181, 501 *A*.2d 505. The Court noted a distinct and distinguishing "difference between ... tolerating in the workplace conditions that will result in a certain number of injuries or illnesses ... and ... actively misleading the employees who have already fallen victim to those risks of the workplace." *Id.* at 182, 501 *A*.2d 505.

*Millison* remains the landmark case on the meaning of intentional wrong. In a series of more recent cases, we have considered factual applications to determine whether particular employer wrongdoing satisfied the substantial-certainty test established in *Millison.*

In *Laidlow v. Hariton Machinery Co.*, 170 *N.J.* 602, 790 *A*.2d 884 (2002), the question was whether an employer who removed a safety mechanism from a dangerous piece of equipment, thereby deceiving safety inspectors regarding the use of appropriate safety

mechanisms in the workplace, had committed an intentional wrong. *Id.* at 606, 790 *A.*2d 884. We determined that where such conduct involving the intentional, and deceptively timed, engaging and disengaging of safety equipment led to the machine's crushing of an employee's hand, *Millison*'s conduct and context prongs both were satisfied. *Id.* at 606–07, 790 *A.*2d 884.

The defendant manufacturer in *Laidlow* required employees to use a rolling mill into which employees would insert metal bars by hand. *Id.* at 607, 790 *A.*2d 884. In 1979, a safety guard was required to be installed in the machine, but from that date until the plaintiff's 1992 injury, the company never kept the safety guard in its appropriate place. *Id.* at 608, 790 *A.*2d 884. The guard was engaged only when OSHA inspectors were present at the plant; it was removed from the machine as soon as inspectors left. *Ibid.* Prior to the plaintiff's injury, the plaintiff and a coworker reported two incidents in which their hands were nearly pulled into the machine. *Id.* at 607–08, 790 *A.*2d 884. The plaintiff specifically had asked, repeatedly, for restoration of the guard, but his supervisor disregarded the request. *Id.* at 608, 790 *A.*2d 884. When the plaintiff's hand was crushed, his injury occurred in a similar manner to the previously reported incidents. *Id.* at 607–08, 790 *A.*2d 884.

When considering whether the defendant's conduct amounted to an intentional wrong, we reiterated the essential holding of *Millison.* We explained that,

under *Millison,* in order for an employer's act to lose the cloak of immunity of *N.J.S.A.* 34:15–8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

[*Id.* at 617, 790 *A.*2d 884.]

In determining that the conduct prong was met, we cited "the prior close-calls, the seriousness of any potential injury that could occur, Laidlow's complaints about the absent guard, and the guilty knowledge of [defendant] as revealed by its deliberate and system-

atic deception of OSHA." *Id.* at 622, 790 *A*.2d 884. However, we declined to issue a per se rule that removal of safety devices or OSHA violations equate to intentional wrongs. *Id.* at 622–23, 790 *A*.2d 884. Instead, they are factors to be considered, given the particular facts of the case; on the facts before us, we concluded that the plaintiff satisfied the context prong as well. *Id.* at 622, 790 *A*.2d 884. In that fact-sensitive conclusion, we stated that

> if an employee is injured when an employer deliberately removes a safety device from a dangerous machine to enhance profit or production, with substantial certainty that it will result in death or injury to a worker, and also deliberately and systematically deceives OSHA into believing that the machine is guarded, we are convinced that the Legislature would never consider such actions or injury to constitute simple facts of industrial life.
>
> [*Ibid.*]

A year later, in *Tomeo v. Thomas Whitesell Construction Co.*, 176 *N.J.* 366, 823 *A*.2d 769 (2003), we again considered an application of the substantial-certainty test. Among his job duties, the plaintiff was expected to assist with snow removal from the employer defendant's buildings. *Id.* at 367, 823 *A*.2d 769. On the day of the plaintiff's injury, the defendant instructed another individual to train the plaintiff in the use of a particular snow blower. *Id.* at 367–68, 823 *A*.2d 769. The safety lever on the snow blower had been taped down to remain constantly in the operational position, although all parties denied taping it. *Id.* at 368, 823 *A*.2d 769. The plaintiff, while later using the snow blower, repeatedly used his hands to push snow through the chute when it became clogged and, eventually, while so doing, his hand became caught in the propellers and was injured. *Ibid.*

In support of a common-law tort action against his employer, the plaintiff asserted that the safety lever was disengaged to allow the company to remove snow at a faster pace and that such behavior constituted an intentional wrong. *Id.* at 369, 823 *A*.2d 769. We affirmed the grant of summary judgment to the employer finding that the plaintiff met neither the conduct nor the context prongs of the substantial-certainty test. *Id.* at 374–75, 823 *A*.2d 769. The plaintiff was using a consumer product containing various warning labels about the type of injury he sustained, not

an industrial piece of equipment. *Id.* at 375–76, 823 *A.*2d 769. We found that even if the defendant had taped down the safety lever, the plaintiff did not produce evidence that the employer was aware of a substantial certainty of injury, and we noted that the defendant's "alleged conduct can be characterized at most as grossly negligent." *Id.* at 376, 823 *A.*2d 769. We likewise found that the plaintiff failed to satisfy the context prong:

> Nor can the context prong, which is a legal determination, be satisfied because plaintiff knew or should have known that the propellers were operating when he inserted his hand into the chute; the labels on the machine clearly warned him of the dangers in this consumer product; and the danger inherent in the snow blower was obvious. Those facts coupled with the presumption that a proper warning of danger will be heeded are dispositive on the context prong.
>
> [*Id.* at 377, 823 *A.*2d 769 (internal citation omitted).]

In two companion cases issued the same day as *Tomeo,* we concluded differently on the substantial-certainty test. Their fact patterns bore a closer resemblance to *Laidlow* in that each involved an OSHA violation among the factors to be considered. We concluded in each that the plaintiffs were entitled to proceed with common-law tort claims against their respective employers. *Mull v. Zeta Consumer Products,* 176 *N.J.* 385, 823 *A.*2d 782 (2003), involved a plaintiff who worked at a plastic-bag manufacturing facility. *Id.* at 387, 823 *A.*2d 782. One of the machines she worked with, a "winder," turned the bags on spools to prepare them for packaging and delivery. *Ibid.* The plaintiff was injured one day when she pressed a stop button on the machine to repair a jam on the winder and, as she was fixing the machine, it suddenly turned on, pulling her hand into it and causing injury. *Id.* at 387–88, 823 *A.*2d 782. She claimed her employer committed an intentional tort and filed a common-law tort action. *Id.* at 388, 823 *A.*2d 782. The trial court denied the defendant's motion for summary judgment, but the Appellate Division reversed. *Id.* at 389, 823 *A.*2d 782.

We granted certification, *ibid.,* and held that the plaintiff presented sufficient facts to proceed to a jury, *id.* at 392, 823 *A.*2d 782. The plaintiff satisfied the conduct prong of the substantial-certainty standard for an intentional wrong because, prior to the

plaintiff's injury, OSHA had cited the defendant for safety violations, the defendant nevertheless had removed safety devices from the winder, another employee had sustained a hand injury while working with the winder, and the employer was aware that employees repeatedly had complained about safety concerns. *Id.* at 392, 823 *A.*2d 782. The employer's callous and long-standing disregard of OSHA safety requirements and compliance was patent and permeated the facts. *See ibid.* Notwithstanding that the employer's deception did not rise to the level presented in *Laidlow,* it clearly affected the Court's totality of the circumstances analysis on the conduct prong. *See ibid.* With respect to the context prong, for reasons similar to those set forth in *Laidlow,* we concluded that the plaintiff satisfied the standard, explaining that "[t]he Legislature would not have considered the removal of the winder's safety devices, coupled with the employer's alleged knowledge of the machine's dangerous condition due to prior accidents and employee complaints, in addition to OSHA's prior violation notices, to constitute simple facts of industrial life." *Id.* at 392–93, 823 *A.*2d 782 (citation and quotation marks omitted).

The facts giving rise to the final case in the *Tomeo* trilogy arose from the death of the plaintiff Harold Crippen in an accident at the defendant's plant. *Crippen v. Cent. Jersey Concrete Pipe Co.,* 176 *N.J.* 397, 399, 823 *A.*2d 789 (2003). Crippen worked as a "material man" and was expected to load sand and gravel into hoppers. *Ibid.* To do so, he had to walk on a narrow plank and stand on an unsecured, six-foot tall ladder. *Id.* at 400, 823 *A.*2d 789. While performing that job responsibility, Crippen fell into the hopper and suffocated. *Ibid.*

Eighteen months prior to Crippen's death, OSHA had cited the defendant for multiple violations, which had not yet been remedied at the time of Crippen's accident. *Id.* at 401–03, 410, 823 *A.*2d 789. The defendant's Environmental Health and Safety Manager also admitted, during discovery, that some of the hazardous conditions that had existed at the plant could cause an employee's death. *Id.* at 403, 823 *A.*2d 789.

Based on those factors, we held that "a jury reasonably could conclude that defendant had knowledge that its deliberate failure to cure the OSHA violations would result in a substantial certainty of injury or death to one of its employees." *Id.* at 409, 823 *A.*2d 789. The context prong was found as a matter of law to be satisfied as well, largely because of the defendant's deliberate decision to ignore the OSHA violations and its efforts to deceive OSHA into believing that the safety violations had been cured. *Id.* at 411, 823 *A.*2d 789. The deceptive nature of the employer's actions was essential to the outcome of the Court's determination, for the majority vote allowing the matter to proceed at the trial level was achieved only by virtue of the concurring opinion that made the employer's deception the linchpin in both the conduct and context prongs of the analysis. *Id.* at 412–13, 823 *A.*2d 789 (Verniero, J., concurring).

These leading cases on the proof essential to a finding of an intentional wrong provide important context to our analysis of plaintiff's claims. Equally important is an understanding of the federal statutory scheme governing workplace safety on construction sites, to which we now turn.

## IV.

With the passage of the Occupational Safety and Health Act of 1970, 29 *U.S.C.A.* §§ 651 to –78, the United States Congress sought "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources," 29 *U.S.C.A.* § 651(b). To that end, Congress authorized the Secretary of Labor—through OSHA—to establish administrative regulations setting forth employment-safety standards. 29 *U.S.C.A.* § 655(a). The regulations are binding on employers whose businesses affect interstate commerce. 29 *U.S.C.A.* §§ 652(3), -(5), 654.

Through OSHA, the Secretary of Labor is authorized to make inspections to assess employer compliance with applicable safety regulations. 29 *U.S.C.A.* § 657(a). If there is a deficiency, OSHA

is required to issue an official citation and order the employer to abate the problem. 29 *U.S.C.A.* § 658. Employers who contest the violation may bring their dispute before the Occupational Safety and Health Review Commission, a body specifically created to handle such challenges. 29 *U.S.C.A.* §§ 659(c), 661(a). If an employer does not contest the violation, it becomes final and is not subject to review by any agency or court. 29 *U.S.C.A.* § 659(a).

■ In this matter, following an OSHA investigation at the construction site where the accident occurred, and an interview with Key, the competent person on-site for the workplace, James was charged with a violation of 29 *C.F.R.* § 1926.652. That section provides in pertinent part:

(a) Protection of employees in excavations.

(1) Each employee in an excavation shall be protected from cave-ins by an adequate protective system designed in accordance with paragraph (b) or (c) of this section except when:

(i) Excavations are made entirely in stable rock; or

(ii) Excavations are less than 5 feet (1.52m) in depth and examination of the ground by a competent person provides no indication of a potential cave-in.

. . . .

(b) Design of sloping and benching systems. The slopes and configurations of sloping and benching systems shall be selected and constructed by the employer or his designee and shall be in accordance with the requirements of [this subsection.]

. . . .

(c) Design of support systems, shield systems, and other protective systems. Designs of support systems shield systems, and other protective systems shall be selected and constructed by the employer or his designee and shall be in accordance with the requirements of [this subsection.]

[29 *C.F.R.* § 1926.652.]

Specifically stating that "[t]he employer had not complied with the provisions of 29 [*C.F.R.*] 1926.652(b)(1)(i) in that the excavation was sloped at an angle steeper tha[n] one and one half horizontal to one vertical (34 degrees measured from the horizontal)," the OSHA report found that the employer failed to protect its employees from cave-ins in accordance with subsection c. The violation was categorized as "willful." 29 *U.S.C.A.* § 666(a) provides that "[a]ny employer who willfully or repeatedly violates the requirements . . . of this title, any standard, rule, or order promulgated

pursuant ... to this title, or regulations prescribed pursuant to this chapter may be assessed a civil penalty of not more than $70,000 for each violation, but not less than $5,000 for each willful violation." The term "willful" is not further defined by statute or in the regulations as far as our research revealed or as the parties were able to illuminate; [6] however, the designation plainly controls the range of penalty that may be imposed. *See* 29 *U.S.C.A.* § 666(j) (setting forth guidelines for Commission to consider when assessing civil penalties, and requiring "due consideration to ... the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the history of previous violations"); *see also* 29 *C.F.R.* § 1903.15(b) (incorporating same factors in determination of penalty).

In support of its "willfulness" determination, OSHA's report indicates that the employer, acting through Key, the on-site competent person (a) knew the requirements of the standard, that is how deep an employee can work before providing protection, (b) knew of the condition, that the filter paper was not laying down properly and that the worker "was just supposed to go in quick and get out," and (c) knew that the work condition as it existed did not comply with the OSHA standard. OSHA concluded its report with the finding that the employer intended the "result, i.e. noncompliance was not an accident or negligence."

This Court has adhered to the legal principle articulated in *Laidlow* that a finding of an OSHA violation does not equate to an

---

[6] The commonly accepted case law definition of "willful violation" is "an act done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements." *Ensign–Bickford Co., supra,* 717 *F.*2d at 1422 (quotation marks and citations omitted). · Although plaintiff points out an earlier Third Circuit decision that described a willful violation in different terms, *see Frank Irey, Jr., Inc. v. Occupational Safety & Health Review Comm'n,* 519 *F.*2d 1200, 1207 (1974), *aff'd en banc,* 518 *F.*2d 990 (1975), *aff'd on other grounds,* 430 *U.S.* 442, 97 *S.Ct.* 1261, 51 *L.Ed.*2d 464 (1977), more recent decisions of the Third Circuit have applied a standard that is fully aligned with the other Courts of Appeal, *see Bianchi Trison Corp., supra,* 409 *F.*3d at 208; *Universal Auto Radiator Mfg. Co. v. Marshall,* 631 *F.*2d 20, 23 (3d Cir.1980).

intentional wrong. *Laidlow, supra,* 170 *N.J.* at 622–23, 790 *A.*2d 884 ("Our holding is not to be understood as establishing a *per se* rule that an employer's conduct equates with an 'intentional wrong' ... whenever that employer removes a guard or similar safety device from equipment or machinery, or commits some other OSHA violation."); *see, e.g., Crippen, supra,* 176 *N.J.* at 408, 823 *A.*2d 789 (citing same). The Appellate Division has treated OSHA violations raised in the context of the Act similarly in the past, *see, e.g., Marinelli v. Mitts & Merrill,* 303 *N.J.Super.* 61, 67, 73, 696 *A.*2d 55 (App.Div.1997) (holding that statutory immunity was not pierced although OSHA issued five citations to employer in accident's wake), and also in this matter, where the panel expressly stated that the existence of the willful violation against defendant was not "conclusive," *Van Dunk, supra,* 415 *N.J.Super.* at 504, 2 *A.*3d 456. The United States District Court for the District of New Jersey also has declined to find the issuance of an OSHA violation as dispositive of an intentional wrong. *See Fermaintt v. McWane, Inc.,* 694 *F.Supp.*2d 339, 349 (D.N.J.2010) (declining to pierce workers' compensation statutory immunity to employer although OSHA issued citation to employer after accident's occurrence).

Thus, the finding of an OSHA violation in the wake of this accident is one factor among the totality of circumstances to be considered in respect of immunity, notwithstanding the categorization of the OSHA violation as willful. As the trial court observed, one cannot glean from the OSHA finding of a willful violation whether the employer's violation of an OSHA requirement was "an intentional disregard or plain indifference." Secondly, that the regulatory noncompliance was, per the OSHA report, "not an accident or negligence" is a far cry from addressing, let alone disposing of, the requirement that the proofs demonstrate a finding of substantial certainty of injury or death. That is the pertinent standard an employee must meet to survive summary judgment on an employer's motion to dismiss a tort action based on the Act's immunity from suit.

Like the trial court and the Appellate Division, we conclude that the finding of a willful violation under OSHA is not dispositive of the issue of whether the employer in this case committed an intentional wrong. We decline to find that every willful OSHA violation constitutes an intentional wrong for purposes of the Act. To do so could produce detrimental consequences, such as encouraging employers to dispute OSHA violations [7] rather than negotiate a penalty and move on, having corrected and been penalized for the error. We therefore conclude that the issuance of a willful violation against James is insufficient to defeat the employer's motion for summary judgment, and turn to consider the totality of the circumstances of this accident, including both the conduct and context prongs of the substantial-certainty standard.

## V.

As *Millison* warned, we approach consideration of the conduct prong with some caution. Mere knowledge by an employer that a workplace is dangerous does not equate to an intentional wrong. *Millison, supra,* 101 *N.J.* at 178, 501 *A.2d* 505. "[T]he dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other must be drawn with caution, so that the statutory framework of the Act is not circumvented simply because a known risk later blossoms into reality. We must demand a virtual certainty." *Ibid.*

The existence of an uncontested finding of an OSHA safety violation in the wake of this workplace injury does not establish the virtual certainty that *Millison* demands. An intentional wrong must amount to a virtual certainty that bodily injury or death will result. *Ibid.* A probability, or knowledge that such injury or death "could" result, is insufficient. Thus, the question here is whether in light of the clear violation of the OSHA safety

---

[7] Otherwise, it would put in the hands of different OSHA inspectors, using a malleable standard for "willfulness," responsibility for determining what our Legislature meant by an "intentional wrong."

requirements pertaining to trenches deeper than five feet, there was substantial certainty of injury or death. On the facts presented, we cannot reach that conclusion without causing a substantial erosion of the legislative preference for the workers' compensation remedy.

The events that transpired at this construction site do not equate to the more egregious circumstances involving intentional and persistent OSHA safety violations that, in the past, we found defeated an employer's motion for summary judgment on the conduct prong analysis. *See, e.g., Crippen, supra,* 176 *N.J.* at 409–10, 823 *A.*2d 789; *Mull, supra,* 176 *N.J.* at 392, 823 *A.*2d 782; *Laidlow, supra,* 170 *N.J.* at 619–22, 790 *A.*2d 884. What distinguishes *Millison, Laidlow, Crippen,* and *Mull* from the present matter is that those cases all involved the employer's affirmative action to remove a safety device from a machine, prior OSHA citations, deliberate deceit regarding the condition of the workplace, machine, or, in the case of *Millison,* the employee's medical condition, knowledge of prior injury or accidents, and previous complaints from employees. *See, e.g., Crippen, supra,* 176 *N.J.* at 409–10, 823 *A.*2d 789; *Mull, supra,* 176 *N.J.* at 392, 823 *A.*2d 782; *Laidlow, supra,* 170 *N.J.* at 620–22, 790 *A.*2d 884; *Millison, supra,* 101 *N.J.* at 182, 501 *A.*2d 505. In particular, this Court was mindful in those cases of the durational aspect of the employer's intentional noncompliance with OSHA requirements or other demonstrations of a longer-term decision to forego required safety devices or practices. *See, e.g., Crippen, supra,* 176 *N.J.* at 410, 823 *A.*2d 789 (discussing defendant's failure to correct OSHA violations for eighteen months prior to plaintiff's death); *Laidlow, supra,* 170 *N.J.* at 620, 790 *A.*2d 884 (discussing defendant's deliberate decision to remove safety devices over thirteen-year period).

The circumstances here are in sharp contrast to the removal of a safety device on a machine on which an employee is expected to continue operating. In this matter, the on-site supervisor made a quick but extremely poor decision, candidly admitted to having

been made "out of frustration" with unfolding circumstances that morning. Key sent an employee into a trench against his own better judgment (based on his earlier refusal to accept plaintiff's volunteering to straighten the filter fabric from inside the trench) to perform a brief task and get out. One cannot conclude that there was an objectively reasonable basis for concluding that the violation of safety protocol was substantially certain to lead to injury or death during the few minutes plaintiff was going to be in the trench, although the risk of harm did blossom, in fact, into serious bodily harm for plaintiff. The truly unfortunate accident that occurred here does not satisfy the substantial-certainty standard used to measure an employer's conduct for purposes of exposure to suit. Even considering the other facts known to Key at the time that could indicate the possibility of a cave-in, *see supra* at 454 n.3, 45 *A*.3d at 968 n.3, none singly or in combination provide an objectively reasonable basis for expecting that a cave-in almost certainly would occur during the brief time plaintiff was sent into the trench.

That is not to say that the poor judgment exercised here is condoned. We consider only whether plaintiff must be satisfied with the relief provided via the preferred legislative remedy of the workers' compensation scheme.

This was an exceptional wrong, not an intentional wrong. The employer may have committed a reckless act; it could be possible to find gross negligence on these proofs. Nevertheless, as the trial court found, plaintiff did not satisfy the conduct prong of the substantial-certainty test of *Millison*. In our view, the Appellate Division's totality of the circumstances analysis overvalued the finding of a willful violation of known OSHA safety requirements, and parlayed the possibility or probability of a cave-in into satisfaction of the substantial-certainty test. However, some level of a "likelihood" of injury or death is not substantial certainty of injury or death. The Act's exclusivity analysis should not shift into an amorphous "percentage of the risk" analysis.

Moreover, we must note that the Appellate Division's analysis credited an argument that this employer disregarded plaintiff's safety "to increase defendant's profit and productivity," *Van Dunk, supra,* 415 *N.J.Super.* at 503, 2 *A.*3d 456, but the record lacks substantial support for that conclusion. The broad language of the panel could be used, inappropriately, to chasten any employer who acts with economic business motivation. In *Laidlow* we used profit consideration language only to critique an employer's long-term choice specifically to sacrifice employee safety for product-production efficiency. *See Laidlow, supra,* 170 *N.J.* at 622, 790 *A.*2d 884. We decline to extend that limited relevance of a profit motive to the circumstances of this case.

As for the context prong, we bear in mind that *Millison* enunciated a unitary test. The conduct and context analyses are related and, here, overlap to great degree. *See, e.g., Crippen, supra,* 176 *N.J.* at 408, 823 *A.*2d 789 (explaining that "same facts and circumstances generally will be relevant to both prongs"); *Laidlow, supra,* 170 *N.J.* at 622, 790 *A.*2d 884 (analyzing similar factors for both conduct and context prongs). We have concluded that the conduct prong is not satisfied in this matter. Although that renders the context prong analysis unnecessary, we choose to address it.

The separate consideration required by the context prong acts as an additional check against overcoming the statutory bar to a common-law tort action. It was added to the analysis to reinforce the strong legislative preference for the workers' compensation remedy. That preference is overcome only when it separately can be shown to the court, as the gatekeeper policing the Act's exclusivity requirement, that as a matter of law an employee's injury and the circumstances in which the injury is inflicted are "plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act." *Millison, supra,* 101 *N.J.* at 179, 501 *A.*2d 505. In *Millison,* that threshold was only met by virtue of the physicians' intentional deception about the true status of employees' medical conditions

when returning the employees to the hazardous worksite, not by the dangers present in the workplace itself due to the known presence of asbestos. *Id.* at 181–83, 501 *A.*2d 505. Thus, *Millison* set a high threshold for the contextual analysis.

That high threshold is not met here. Where the exclusivity bar of the Act operates to foreclose tort actions against employers for reckless or gross negligence under the substantial-certainty test—a standard accepted by the Legislature for more than two-and-one-half decades—one cannot reasonably conclude that the type of mistaken judgment by the employer and ensuing employee accident that occurred on this construction site was so far outside the bounds of industrial life as never to be contemplated for inclusion in the Act's exclusivity bar. While a single egregiously wrong act by an employer might, in the proper circumstances, satisfy the intentional-wrong standard, not every intentional, or indeed willful violation of OSHA safety requirements constitutes a wrong that is "plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act." *Id.* at 179, 501 *A.*2d 505. As a matter of law, we conclude that the context prong is not satisfied in this setting, notwithstanding that the employer was found, after the accident, to have committed a willful violation of OSHA safety requirements.

In sum, the Workers' Compensation Act circumscribes plaintiff's ability to pursue a tort action against his employer. Although a reasonable fact-finder could determine that the employer's actions constituted gross negligence, that showing is not enough to overcome the Act's exclusivity requirement. We hold that neither the conduct nor the context prongs of the *Millison* substantial-certainty test is satisfied in this matter. Accordingly, the Act's exclusivity provision and, specifically, its statutory bar, prevail to bar plaintiff's action against his employer.

## VI.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judge WEFING (temporarily assigned)—6.