**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0242-18T2

MARGARET ALLEN,

     Plaintiff-Appellant,

v.

MB MUTUAL HOLDING
COMPANY, d/b/a MANASQUAN
BANK/MANASQUAN SAVINGS
BANK, JAMES VACARRO,
ROSEANNE JOHNSON, and
STEVE YAROSZ,

     Defendants-Respondents.

_____

Argued May 8, 2019 - Decided June 6, 2019

Before Judges Nugent and Mawla.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-0410-18.

Brian W. McAlindin argued the cause for appellant (Bathgate, Wegener & Wolf, PC, attorneys; Brian W. McAlindin, of counsel and on the briefs; Kyle R. Tognan, on the briefs).

Kenneth A. Rosenberg argued the cause for respondents (Fox Rothschild, LLP, attorneys; Kenneth A. Rosenberg, of counsel and on the brief; Asad Rizvi, on the brief).

PER CURIAM

Plaintiff Margaret Allen appeals from an August 2, 2018 order dismissing her second amended complaint against defendants, her co-workers, and employer, for failure to state a personal injury claim pursuant to the Workers' Compensation Act (Act), N.J.S.A. 34:15-1 to -142. We affirm.

We take the following facts from plaintiff's second amended complaint. Plaintiff worked as branch manager of the Manasquan Bank branch located in Brick. Beginning in 2007, she submitted monthly property inspection reports detailing problems with the building and deficiencies in its maintenance. Specifically, plaintiff complained the building smelled like sitting water and notified her superiors that water damage repairs were necessary. She asserted the bank made improper repairs, which did not remedy the underlying problems of water leaking into the building and alleged mold.

Beginning in 2010, plaintiff claimed she suffered from seizures, sinus infections, diabetes, aches and pains, fibromyalgia, headaches, memory loss, and exhaustion. The symptoms purportedly worsened while she was at work. She began consulting doctors in December 2010. In February 2016, each of

plaintiff's doctors advised her to cease working in an office contaminated with mold.

The same month, plaintiff met with James Vaccaro, the president of MB Mutual, and Roseanne Johnson, a human resources representative, to discuss the potential mold problem and her doctors' concerns. Plaintiff claimed Vaccaro was uninterested in examining her medical records and questioned the motives behind her claims. Vaccaro then inquired of Johnson, who confirmed there was mold contamination. Johnson previously worked in accounting at the Brick location and had been responsible for approving payments for prior mold remediation efforts.

A few days after the meeting, defendants engaged 20/20 Home Inspection to perform a mold test of the building. The report noted "[m]olds are part of the natural environment and are simple, microscopic organisms whose purpose is to break down dead materials. Molds can be found on plants, dry leaves and about every other organic material." It also stated "[m]old spores are present in virtually all environments, both indoors and outdoors, with a few notable exceptions such as industrial clean rooms and hospital organ transplant rooms."

The report indicated "[a]n inside air sample was collected from [four] interior areas and the crawlspace. The samples were sent to the laboratory for

3

analysis. The air samples collected from the crawlspace and [plaintiff']s office have elevated spore concentrations or abnormal spore types present." However, the report noted a "low" MoldSCORE for plaintiff's office, the teller's office, the construction area, and the rear storage area and bathrooms. According to the report, "[a] low MoldSCORE[] indicates the air sample did not detect, relative to the outside air, the presence of indoor mold growth in this room at the time of sampling."

The only area receiving a "high" MoldSCORE was the crawlspace. The report noted the existence of a ventilation system "that draws outside air into the crawlspace." It further noted the system "appear[ed] to be potentially creating positive pressure which [was] likely aiding the spread of mold spores to the rest of the building and living spaces."

The report recommended cleaning and remediation of mold found in the crawlspace and any other areas where mold was present. The report stated:

> [o]ccupants and visitors should be restricted from the areas being cleaned and repaired. If there have been health complaints, the [c]lient / owner may want to have occupants in adjacent areas relocate if their concerns are reasonable. Vacating people from adjacent non-impacted spaces is generally not necessary if complete and proper procedures are followed.

A-0242-18T2

The report recommended the ventilation system be replaced with "properly sized dehumidifiers."

The Brick branch continued operations after defendants received the report and plaintiff returned to work. Defendants shut down an area of the building designated for remediation and moved the employees who were stationed there to plaintiff's side of the building.

Plaintiff alleged her cognitive issues significantly worsened. She called her son to pick her up from the office on several occasions because she experienced severe dizziness and could not walk. She also claimed she developed a serious rash, which her doctors diagnosed as caused by exposure to toxic mold spores. Plaintiff alleged she repeatedly informed defendants of the severity of the mold issue and her increasing health problems.

Defendants shut down the Brick branch one month after plaintiff's meeting with Vaccaro. Plaintiff claimed this occurred after multiple employees became ill. After the shutdown, plaintiff alleged defendants forced her to return to the office on several occasions to retrieve files and materials from customer safety deposit boxes. She alleged she informed defendants of her worsening health condition and that her doctors had advised her not to return to the building, but defendants stated they did not care and she needed to retrieve the items. She

5

further alleged defendants did not give her safety equipment when they ordered her to return to the building and her symptoms were aggravated each time she reentered the building.

Plaintiff filed a three-count complaint alleging defendants had committed an intentional wrong, an exception to the Act's exclusive remedy provision. N.J.S.A. 34:15-8. Plaintiff also alleged fraudulent concealment and negligence. She filed an amended complaint, which alleged she suffered from medical issues because defendants intentionally concealed the mold and directed her to work in the building, despite knowledge of the mold contamination and her medical issues.

After the amended complaint was dismissed for failure to state a claim, plaintiff filed a second amended complaint. This complaint alleged additional facts in support of her claims, and asserted a claim of willful and wanton misconduct, rather than negligence. The motion judge dismissed the second amended complaint for failure to state a claim and issued a written statement of reasons.

The judge found plaintiff had failed to allege sufficient facts to support a claim defendants had committed an intentional wrong pursuant to N.J.S.A. 34:15-8. The judge stated:

A-0242-18T2

Based on the facts [pled] in the [c]omplaint, [p]laintiff has not demonstrated that [d]efendants acted with "substantial certainty" that the mold would harm employees. First, concerning [defendants'] conduct . . . , the facts alleged do not appear to demonstrate [d]efendants knew with "substantial certainty" that the mold would cause death or injury. While the [c]ourt acknowledges that [d]efendants knew of the mold as early as 2006, by [p]laintiff's own statements the mold was not officially linked with any health issues for [p]laintiff until February 2016. Next, on February 12, 2016, a meeting was held to address the mold issue. Eight days later, on February 20, 2016, an inspection was undertaken by [d]efendants at the [b]ank. At some point between February 20, 2016, and February 29, 2016, part of the [b]ank was closed for construction. On March 11, 2016 the bank was closed [altogether]. . . .

Essentially in about a month's time of learning of the serious nature of the mold contamination [d]efendants, held a meeting, scheduled and completed an inspection, moved employees, and then closed the [b]ank for construction. This does not appear to be the actions of an employer acting with substantial certainty that their employees will be injured or die. In contrast, it appears that [d]efendants are attempting to address the mold issue and prevent further harm. At most, [d]efendants tolerated the presence of mold for an extended period of time and then took action once serious medical illnesses were reported. This is not the sort of conduct which rises to the level of intentional wrong. Millison [v. E.I. Du Pont de Nemours & Co.], 101 N.J. [161, 181-82 (1985).] (There is a difference between, on the one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illnesses, and, on the other, actively misleading the employees who have already fallen

7

victim to those risks of the workplace. An employer's fraudulent concealment of diseases already developed is not one of the risks an employee should have to assume). Certainly, there are no facts alleged which state [d]efendants somehow concealed the adverse impacts of the mold on [p]laintiff. Plaintiff claims the mold itself was concealed, but such concealment and exposure is explicitly covered by the [Worker's Compensation] Act. Id. at 188. In Millison's ultimate holding the [c]ourt unambiguously states "[a]s to so much of plaintiff's complaints as seek damages for deliberate exposure to asbestos and to the risks associated with that exposure, we hold that those claims are compensable exclusively under the Compensation Act." Ibid.

The judge concluded defendants directing plaintiff to enter the building without safety equipment did not constitute an intentional wrong because "it is not enough that [d]efendants understood there was a probability that [p]laintiff would be injured by the mold, [d]efendants had to be certain that [p]laintiff would be injured."

The judge further stated:

Second, concerning the context prong, [p]laintiff does not plead sufficient facts . . . to demonstrate "the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Worker's Compensation Act to immunize." Laidlow [v. Hariton Mach. Co., Inc.,] 170 N.J. [602,] 617 [(2002)]. Mold and the accompanying illnesses are not beyond the intentions of the . . . Act, in the same way exposure to asbestos is

8

not beyond the intentions of the Act. In fact mold, that can be present in any building at any time, surely is a fact of industrial life meant to be immunized from suit by the . . . Act. Ibid. This does not rise to the abnormal levels of deceit and disregard for safety present in a case like Millison.

The judge dismissed the complaint with prejudice for failure to plead sufficient facts to support a finding of intentional wrong and dismissed the remaining claims because the facts pled did not overcome the Act's exclusive remedy bar. This appeal followed.

## I.

Appellate review of a trial court's ruling on a motion to dismiss is de novo. Frederick v. Smith, 416 N.J. Super. 594, 597 (App. Div. 2010). "A complaint should be dismissed for failure to state a claim pursuant to Rule 4:6-2(e) only if 'the factual allegations are palpably insufficient to support a claim upon which relief can be granted.'" Ibid. (quoting Rieder v. State Dep't of Transp., 221 N.J. Super. 547, 552 (App. Div. 1987)). "This standard requires that 'the pleading be searched in depth and with liberality to determine whether a cause of action can be gleaned even from an obscure statement.'" Ibid. (quoting Seidenberg v. Summit Bank, 348 N.J. Super. 243, 250 (App. Div. 2002)).

A motion to dismiss a complaint under Rule 4:6-2(e) "must be based on the pleadings themselves." Roa v. Roa, 200 N.J. 555, 562 (2010). For purposes

A-0242-18T2

of the motion, the "complaint" includes the "'exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.'" Banco Popular N. Am. v. Gandi, 184 N.J. 161, 183 (2005) (quoting Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004)).

Plaintiff argues the motion judge's determination that she failed to plead sufficient facts to prove the substantial certainty test set forth in Millison was error. She argues the second amended complaint satisfied Millison because defendants had notice of the existence of mold in the office and her illness. Plaintiff also argues the motion judge's incorrectly relied on Millison because that case involved a summary judgment motion where the parties had engaged in discovery. She asserts there was no opportunity for discovery to examine the extent of defendants' knowledge of the mold contamination and her medical condition.

## II.

> The Workers' Compensation Act reflects "a historic trade-off whereby employees relinquish[] their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffer[] injuries by accident arising out of and in the course of employment." Stancil v. ACE, USA, 211 N.J. 276, 285 (2012) (quoting Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 174 (1985)). In essence, by virtue of accepting guaranteed benefits under the Act, "the employee agrees to forsake a tort

action against the employer." Ramos v. Browning Ferris Indus., Inc., 103 N.J. 177, 183 (1986) (citing Morris v. Hermann Forwarding Co., 18 N.J. 195, 197-98 (1955)). Therefore, subject to certain statutory exceptions, the Act provides the exclusive remedy for an employee who sustains a work-related injury to obtain relief from his employer. See Van Dunk v. Reckson Assocs. Realty Corp., 210 N.J. 449, 459 (2012) ("The Act's exclusivity can be overcome if the case satisfies the statutory exception for an intentional wrong."); see also Laidlow v. Hariton Mach. Co., Inc., 170 N.J. 602, 611 (2002) (referring to N.J.S.A. 34:15-8 as "the so-called exclusive remedy provision").

[Caraballo v. City of Jersey City Police Dep't, 237 N.J. 255, 264-65 (2019).]

The Supreme Court first construed the intentional wrong exception under the Act in Millison and held:

[T]he statutory scheme contemplates that as many work-related disability claims as possible be processed exclusively within the Act. Moreover, if "intentional wrong" is interpreted too broadly, this single exception would swallow up the entire "exclusivity" provision of the Act, since virtually all employee accidents, injuries, and sicknesses are a result of the employer or a co-employee intentionally acting to do whatever it is that may or may not lead to eventual injury or disease.

[Id. at 177.]

The Court explained an employer's exposure of an employee to risk and danger must be egregious and

11

the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong.

[Ibid. (citing W. Prosser and W. Keeton, The Law of Torts, § 8 at 36 (5th ed. 1984)).]

The Court concluded the employer must knowingly expose the employee to a substantial certainty of injury, and the resulting injury must not be "a fact of life of industrial employment" and must be plainly beyond anything the Legislature intended the Act to immunize. Id. at 178-79.

The Court examined the intentional wrong standard in Laidlow. There, the employer disengaged a safety device for reasons of speed and efficiency. 170 N.J. at 606. The Court held the employer acted with knowledge that it was substantially certain a worker would suffer an injury when the employer tied a safety guard on a rolling mill, releasing it only when OSHA inspectors were present, and where there had been several near accidents reported to the employer. Id. at 620-22. The Court concluded an employee injury under such circumstances would never constitute a fact of industrial life. Id. at 622.

In Van Dunk, 210 N.J. at 474, the Court held the Act's exclusivity bar applied even where the workplace accident produced a "willful violation of

OSHA safety requirements." In that case, an employee entered an unsupported trench to a depth beyond the reach of safety equipment and the trench collapsed on him. Id. at 453-54.

The Court held the OSHA violation and "[a] probability, or knowledge that . . . injury or death 'could' result, is insufficient" evidence of an intentional wrong. Id. at 470. Instead, the "intentional wrong must amount to a virtual certainty that bodily injury or death will result." Ibid. Furthermore, the Court observed that the "high threshold" of the context prong was not met by "the type of mistaken judgment by the employer and ensuing employee accident that occurred on [the] construction site[.]" Id. at 474.

Therefore, the knowing failure to take safety precautions does not constitute the type of egregious conduct associated with an intentional wrong. An intentional wrong must be accompanied by something more, typically deception, affirmative acts that defeat safety devices, or a willful failure to remedy past violations. See Laidlow, 170 N.J. at 616 (quoting Millison, 101 N.J. at 179) (noting that the "mere toleration of workplace hazards 'will come up short' of substantial certainty"). Absent such egregious conduct, the employee is limited to the worker's compensation remedy.

Plaintiff claims defendants were aware of the mold contamination in the office and her mold-exposure-related medical issues. She argues defendants committed an intentional wrong by forcing her to work in the building despite knowledge of her doctors' orders to cease working in proximity to mold. However, plaintiff concedes her medical issues were not linked to mold exposure in the Brick office until February 2016. Indeed, the mold inspection report noted plaintiff's office had low mold contamination numbers. Further, as defendants quickly engaged the services of an inspection company. Shortly after the inspection, defendants closed a portion of the bank to remediate the mold problems and ultimately closed the building altogether.

Plaintiff's pleading asserts no facts to demonstrate defendants deliberately deceived others regarding the condition of the workplace or employee illness, removed safety devices which facilitated mold growth, or ignored prior injuries, accidents, or employee complaints regarding a dangerous condition that was not a part of ordinary industrial employment. Rather, plaintiff's second amended complaint sounded in negligence alleging defendants failed to adequately remediate the dangerous condition and ordered plaintiff to retrieve documents from the building. The facts pled do not establish defendants acted with intent to harm or substantial certainty their conduct would result in bodily injury or

14

death. "[A] work-place injury caused by either gross negligence or an abysmal lack of concern for the safety of employees" does not establish an intentional wrong. See Marinelli v. Mitts & Merrill, 303 N.J. Super. 61, 72 (App. Div. 1997).

Finally,

> [t]he separate consideration required by the context prong [of the substantial certainty test] acts as an additional check against overcoming the statutory bar to a common-law tort action. It was added to the analysis to reinforce the strong legislative preference for the workers' compensation remedy. That preference is overcome only when it separately can be shown to the court, as the gatekeeper policing the Act's exclusivity requirement, that as a matter of law an employee's injury and the circumstances in which the injury is inflicted are "plainly beyond anything the [L]egislature could have contemplated as entitling the employee to recover only under the Compensation Act." Millison, 101 N.J. at 179. In Millison, that threshold was only met by virtue of the physicians' intentional deception about the true status of employees' medical conditions when returning the employees to the hazardous worksite, not by the dangers present in the workplace itself due to the known presence of asbestos. Id. at 181-83. Thus, Millison set a high threshold for the contextual analysis.
>
> [Van Dunk, 210 N.J. at 473-74.]

The second amended complaint does not plead facts demonstrating plaintiff's symptoms and exposure to mold were the product of intentional

A-0242-18T2

deception by defendants. Accepting, as we must, the facts alleged in the second amended complaint as true, and interpreting them under the liberal standard required when a court considers a dismissal motion under <u>Rule</u> 4:6-2(e), plaintiff failed to satisfy the substantial certainty test to prove an intentional wrong to overcome the Act's exclusive remedy bar. Plaintiff's injuries, and the circumstances in which she allegedly incurred them, were not beyond the scope of the recovery envisioned by the Legislature in the Act. For these reasons, dismissal of the second amended complaint was appropriate.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION