NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4711-18T1

CARLTON HOCUTT III,

    Plaintiff-Appellant,

v.

MINDA SUPPLY COMPANY

    Defendant-Respondent,

and

MINDA SUPPLY COMPANY,

    Defendant/Third-Party Plaintiff,

v.

NATIONWIDE INSURANCE
COMPANY d/b/a HARLEYSVILLE
WORCESTER INSURANCE CO,

    Third-party defendants.
_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **August 7, 2020** |
| **APPELLATE DIVISION** |

        Argued telephonically April 20, 2020 –
        Decided August 7, 2020

        Before Judges Ostrer, Vernoia and Susswein.

        On appeal from the Superior Court of New Jersey,
        Law Division, Bergen County, Docket No. L-6537-17.

Joseph M. Cerra argued the cause for appellant (Lynch Lynch Held & Rosenberg, PC, attorneys; Joseph M. Cerra, on the briefs).

Lance J. Kalik, argued the cause for respondent (Riker Danzig Scherer Hyland & Perretti, LLP, attorneys; Lance J. Kalik, of counsel and on the brief; Alfonse R. Muglia, on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.S.C. (temporarily assigned)

Plaintiff, Carlton Hocutt, III, appeals from a grant of summary judgment in favor of defendant, Minda Supply Co. (Minda). Hocutt was injured in a forklift accident while working at Minda's warehouse. He sued Minda claiming the company was negligent in directing him to ride as a passenger on a forklift in violation of federal workplace safety regulations. The trial court dismissed the complaint, ruling that Hocutt's exclusive remedy rests in workers' compensation.

Hocutt contends the trial court erred in applying the New Jersey Workers' Compensation Act (WCA), N.J.S.A. 34:15-1 to -146. He asserts that he was not employed by Minda but rather by an employee leasing agency. He further contends that even if he were deemed to be an employee of Minda for purposes of the WCA, he is not barred under the statute from suing Minda because the company committed intentional wrong. After reviewing the record

in view of the applicable legal principles and the parties' arguments, we reject Hocutt's contentions and affirm the grant of summary judgment.

## I.

In September 2017, Hocutt filed a civil complaint against Minda alleging that his injury was caused by the company's negligence. Minda asserted as an affirmative defense that Hocutt's claim is precluded by the WCA, which generally provides exclusive remedies for workplace injuries. Once discovery was completed, Minda moved for summary judgment. After hearing oral argument, the Law Division judge granted Minda's motion for summary judgment, dismissing Hocutt's complaint with prejudice.

## II.

Minda operates a warehouse that stores goods for the dry-cleaning industry. Forklifts are used at the warehouse to move pallets of supplies. It was a common practice at the warehouse for a worker to ride on the forklift, standing on either the front or back of the forklift while it was moving. This practice violates federal workplace safety regulations.

Minda uses the services of an employee leasing agency, Express. The staffing agreement between Minda and Express provides that Express is responsible for paying the loaned workers. Minda reimburses Express for those wage payments by agreeing "to pay the charges based on the time card or

other mutually acceptable recording method." The staffing agreement specifies that Minda will "supervise, direct, and control the work" of the employees Express loans to Minda. The staffing agreement also authorizes Minda to hire a loaned worker after a set period of time or for an agreed upon fee.

Hocutt registered with Express looking for work. Hocutt initially turned down several work opportunities that were offered by Express, eventually accepting an opportunity to work at Minda's warehouse. Hocutt reported to Minda the next day.

On his second day working at the warehouse, Hocutt was instructed by his supervisor, Rich, to team up with a forklift operator, Will. Rich told Hocutt that Will was "real fast paced" and that Hocutt could "learn a lot from him." Will had worked at Minda for approximately a year.

Minda had assigned Will to drive forklifts after only several months of employment because of a shortage of forklift operators. Will had operated forklifts at a prior job where he had been provided with some informal instruction and attended a certification class. Will never presented Minda with the certification. Minda "took [Will's] word for it" and allowed Will to operate a forklift. Minda provided Will informal instruction on how to operate the

machine and allowed him to practice when employees were not busy, and another operator was available to watch.

Hocutt, Will, and Rich observed a forklift pass by. An employee was standing on the forklift as a passenger. Rich pointed to it and told Hocutt, "you are going to get on the forklift like that." Shortly thereafter, Hocutt positioned himself on the back of the forklift that Will was operating. After just a few minutes, Will inadvertently backed the forklift into an I-Beam. Hocutt's leg was seriously injured in the collision and he was taken to a hospital by ambulance. The injury required a skin graft and four surgeries.

Following the accident, the U.S. Department of Labor Occupational Safety and Health Administration (OSHA) issued three citations to Minda. The first citation, which was classified as "serious," cited a violation of 29 C.F.R. 1910.178(I)(1)(i) for allowing an employee to operate a forklift without proper training and evaluation. The second citation, which was also classified as "serious," cited a violation of 29 C.F.R. 1910.178(m)(3) for allowing an employee to ride on the forklift. OSHA issued a third "other-than-serious" citation for a violation of 29 C.F.R. 1904.39(a)(2) for failing to report the hospitalization of an employee to OSHA within twenty-four hours.

## III.

We begin our analysis by acknowledging certain legal principles that govern this appeal. As a general proposition, a court must grant summary

judgment if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2. When reviewing a motion court's grant of summary judgment, an appellate court uses the same standard as the motion court. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (citations omitted). First, we must decide whether there was a genuine issue of fact. In re Estate of DeFrank, 433 N.J. Super. 258, 265 (App. Div. 2013) (citations omitted). When reviewing summary judgment, we view the facts "in the light most favorable to the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). If there is no genuine issue of fact, then we must decide whether the lower court correctly ruled on the law. Estate of DeFrank, 433 N.J. Super. at 267 (citing Walker v. Atl. Chrysler Plymouth, Inc., 216 N.J. Super. 255, 258 (App. Div. 1987)).

In this case, there does not appear to be a dispute with respect to the pertinent facts. Both parties agree that Minda employees engaged in a practice of riding on forklifts. Accordingly, this case hinges on the trial court's interpretation of the WCA.

In construing that statute, we take note that it "accomplished a 'historic trade-off whereby employees relinquished their right to pursue common-law

6

remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment.'" Van Dunk v. Reckson Assocs. Realty Corp., 210 N.J. 449, 458–59 (2012) (quoting Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 174 (1985)). Generally, when the parties have accepted the provisions of the Act, "the agreement operates as an employee's surrender of other forms of remedies." Id. at 459 (citing N.J.S.A. 34:15-8).

Hocutt contends the trial court misinterpreted the statute in ruling that it barred him from bringing suit against Minda. He raises two distinct legal arguments in support of that contention: (1) he was not an employee of Minda for purposes of the WCA; and (2) Minda committed "intentional wrong," thereby exempting this case from the exclusive remedy of the WCA. We address each of these contentions in turn.

IV.

The trial court found that Hocutt was a "special employee" of Minda, which was Hocutt's "special employer." Hocutt disputes that determination on the grounds that he did not give "informed consent" to the special employee-employer relationship. We reject that contention.

In Kelly v. Geriatric & Medical Services, Inc., we developed a five-pronged test to assist courts in determining whether a worker is a special

employee for purposes of the WCA.  287 N.J. Super. 567, 571–72 (App. Div. 1996).  We explained:

> The applicable, though not exclusive, legal criteria to establish a special employer-special employee relationship involves the following fact-sensitive five-pronged test:
>
> (1) the employee has made a contract of hire, express or implied, with the special employer;
>
> (2) the work being done by the employee is essentially that of the special employer;
>
> (3) the special employer has the right to control the details of the work;
>
> (4) the special employer pays the employee's wages; and
>
> (5) the special employer has the power to hire, discharge or recall the employee.
>
> [Id. at 571–72.]

In Kelly, we concluded that the plaintiff who was employed through a staffing agency, like Hocutt, was a "special employee."  Id. at 577–78.

The key factor in dispute in this case is whether "the employee has made a contract of hire, express or implied, with the special employer."  Id. at 571. Hocutt relies on our decision in Blessing v. T. Shriver & Co. to support his contention that the first prong has not been established.  94 N.J. Super. 426,

436 (App. Div. 1967). Our interpretation of <u>Blessing</u> leads us to a contrary conclusion. In <u>Blessing</u>, we emphasized the importance of

> the fact that the proofs do not suggest any consensual relationship between plaintiff, a so-called 'loaned' employee, and defendant for whose benefit his services as a guard were rendered. While such a consent <u>may be expressed or implied</u>, there is nothing in the record upon which to predicate a finding of knowledgeable consent or a fair inference that an employment relationship between those parties existed.
>
> [<u>Ibid.</u> (emphasis added).]

We believe that in the present case there is, at least, an implied consensual relationship between Hocutt and Minda. In <u>Antheunisse v. Tiffany & Co.</u>, we concluded the plaintiff had impliedly contracted with the special employer by voluntarily reporting to the special employer's workplace after the staffing agency provided her the name of the employer and advised her as to the nature of the work. 229 N.J. Super. 399, 404 (App. Div. 1988). Furthermore, the staffing agency provided her an "opportunity to refuse the job without fearing any reprisal from the agency." <u>Ibid.</u>

In this instance, the record shows that Hocutt turned down job offers from Express before accepting the opportunity to work at Minda's warehouse. Hocutt's decision to decline work offers was done without fear of reprisal from

the agency as shown by the fact that Express continued to present work opportunities to Hocutt.

Furthermore, Hocutt accepted the offer from Express to work at Minda's warehouse and reported to the warehouse to work.  He returned to work at the warehouse the next day and accepted instructions from a Minda supervisor.  In these circumstances, we conclude that Hocutt impliedly consented to a special employee-employer relationship.

We add that even were we to assume for purposes of argument that there was some uncertainty as to the consensual nature of the relationship between Hocutt and Minda, it is not necessary to establish all five factors for a worker to be deemed to be a special employee under the Kelly test.  In that case, for example, we concluded the plaintiff was a special employee notwithstanding the failure to prove prong four—the special employer paid the employee's wages.  287 N.J. Super. at 573, 577 ("We have given little weight to [prong four] in our finding of special employment.").

Although the remaining four prongs of the Kelly test do not appear to be in dispute in the matter before us, we note that they are indeed established by the undisputed facts.  The third and most important prong—that the special employer controls the work—certainly applies in this case.  See Volb v. G.E. Capital Corp., 139 N.J. 110, 116 (1995) ("[T]he most important factor in

determining a special employee's status is whether the borrowing employer had the right to control the special employee's work."). When Hocutt reported to the warehouse, a Minda supervisor assigned his tasks for the day. Further, the staffing agreement expressly provides: "[Minda] will supervise, direct, and control the work performed by [Express's] associates." There is little doubt that Minda controlled Hocutt's work at the warehouse.

Additionally, prong two is clearly established. Hocutt's work at Minda was "essentially that of the special employer" because his assigned tasks were directly related to Minda's dry cleaning warehouse business. See Kelly, 287 N.J. Super. at 572 (observing the employee did not dispute that the nursing work she performed for a health care facility was essentially that of the health care facility); Antheunisse, 229 N.J. Super. at 404 (noting the employee conceded "her assigned task of packing china and crystal" was definitely a part of the regular business of Tiffany's packing department).

Prong four also is satisfied. The staffing agreement provides that while Express would directly pay loaned workers, Minda agreed "to pay [Express] the charges based on the time card or other mutually acceptable recording method." This arrangement is significantly different from the payment scheme in Kelly where the employee was paid by the staffing agency and the fee the special employer paid to the staffing agency was not tied to the employee's

A-4711-18T1

actual wages. 287 N.J. Super. at 573. We noted in Kelly this prong could have been met if, instead, "the wages were paid directly by [the special employer], or if the fee paid to the [staffing] agency was based on a percentage scale linked to the employee's wages." Id. at 577 (emphasis added). In the present case, Minda agreed to reimburse Express for the monies Express paid to loaned workers. The fee Minda paid to Express, in other words, was linked directly to Hocutt's wages.

Finally, the fifth prong—that the special employer can hire, discharge, or recall the employee—is also established. The staffing agreement expressly provides that Minda could hire an Express employee after a period of time or for a fee. Minda thus clearly had the power to hire Express employees, including Hocutt.

Considering all of the Kelly factors, we conclude, as did the trial court, that Hocutt was a "special employee" of Minda. Hocutt's status as a special employee thus subjects him to the exclusive remedy of workers' compensation.[1]

---

[1] Although not addressed by the motion court, another provision of the WCA subjects Hocutt to the exclusive remedy of workers' compensation. In particular, N.J.S.A. 34:8-72(b) expressly extends statutory immunity from suit to companies that hire or lease workers from employee leasing companies. This statute provides an independent basis for the conclusion that Hocutt is subject to the exclusive remedy of workers' compensation. See State v.

V.

We turn next to Hocutt's argument that his suit is not barred under the WCA because Minda's conduct constitutes intentional wrong. N.J.S.A. 34:15-8 provides:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

> [(Emphasis added).]

Our survey of the case law interpreting this exception leads us to conclude that Minda's conduct was not sufficiently egregious to rise to the level of intentional wrong.

A.

The New Jersey Supreme Court set the framework for our analysis in Millison. The Court replaced the previous "deliberate intention" standard with a "substantial certainty" test. Id. at 178. We believe the Court thereby intended to narrow the circumstances when the intentional wrong exception applies in recognition that reckless or negligent conduct all too often reflects a

---

(continued)
Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) ("We are free to affirm the trial court's decision on grounds different from those relied upon by the trial court.").

"deliberate" decision by employers to promote speed and efficiency at the cost of reduced workplace safety. In adopting the new standard, the Court explained, "the dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other must be drawn with caution, so that the statutory framework of the Act is not circumvented simply because a known risk later blossoms into reality. We must demand a virtual certainty." Ibid.

To further aid trial and appellate courts in determining whether intentional wrong was committed for purposes of the WCA, the Court created a two-pronged test consisting of a "conduct" prong and a "context" prong. Id. at 178–79. The Court held:

> Courts must examine not only the conduct of the employer, but also the context in which that conduct takes place: may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act?
>
> [Id. at 179 (emphasis omitted).]

To sum up, the Court in Millison held that to fall under the intentional wrong exception to the general rule that bars employees from suing employers for workplace injuries, a plaintiff must first establish the employer knew that

14

that its actions were substantially certain to result in injury or death to the employee. The plaintiff must further show that the resulting injury and the circumstances of its infliction were more than a fact of life of industrial employment and plainly beyond anything the Legislature intended the WCA to immunize.

The Court in <u>Millison</u> applied this analytical template to a situation where the employer knowingly exposed its employees to asbestos. The employees claimed the WCA did not bar their lawsuit because the company's doctors failed to properly inform them of the progression of their asbestos-related diseases. <u>Id.</u> at 181–82. Chest x-rays revealed the asbestos-related conditions, but the employer's doctors told the employees that "their health was fine and sent them back to work under the same hazardous conditions that caused the initial injuries." <u>Id.</u> at 182. The Court emphasized the importance of fraud and deception in determining whether there is intentional wrong. The Court explained:

> There is a difference between, on the one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illnesses, and, on the other, actively misleading the employees who have already fallen victim to those risks of the workplace. An employer's fraudulent concealment of diseases already developed is not one of the risks an employee should have to assume. Such intentionally-deceitful action goes beyond the bargain struck by the Compensation Act.

[Ibid.]

Subsequent Supreme Court precedents embrace and amplify the reasoning in Millison, providing further guidance on how to distinguish negligent or reckless culpability from intentional wrong. In Laidlow v. Hariton Machinery Co., an employer removed a safety mechanism from a piece of equipment but replaced it prior to inspections. 170 N.J. 602, 606–09 (2002). The Court ultimately determined that the "conduct involving the intentional, and deceptively timed, engaging and disengaging of safety equipment . . . [satisfied the] conduct and context prongs." Van Dunk, 210 N.J. at 462 (citing Laidlow, 170 N.J. at 606–07). It is noteworthy that the Court explicitly declined to adopt a per se rule that an employer's removal of a safety device, or commission of an OSHA violation, constitutes intentional wrong. Laidlow, 170 N.J. at 622–23. The critical circumstance in Laidlow was that the periodic removal and replacement of the safety devices was timed to deceive inspectors.

In Mull v. Zeta Consumer Products, the Court considered a situation where the employer was aware of prior injuries and ignored citations for safety violations. 176 N.J. 385 (2003). The Court concluded the plaintiff satisfied the conduct prong of the Millison test because OSHA had cited defendant for several safety violations, the defendant had removed several safety devices

16

from the machine, another employee had sustained an injury operating the same equipment, and the defendant was aware employees repeatedly complained about safety concerns. Id. at 392.

The Court also found that the context prong was satisfied, noting "[t]he Legislature would not have considered the removal of the winder's safety devices, coupled with the employer's alleged knowledge of the machine's dangerous condition due to prior accidents and employee complaints, in addition to OSHA's prior violation notices, 'to constitute simple facts of industrial life.'" Id. at 392–93 (quoting Laidlow, 170 N.J. at 622).

In a companion case, Crippen v. Central Jersey Concrete Pipe Co., the Court likewise emphasized that OSHA had cited the employer for numerous serious violations that had not been corrected before the plaintiff's fatal accident. 176 N.J. 397, 401–03 (2003). The Court held "a jury reasonably could conclude that defendant had knowledge that its deliberate failure to cure the OSHA violations would result in a substantial certainty of injury or death to one of its employees." Id. at 409.

The Court also determined that the plaintiff had satisfied the context prong. The employer not only failed to remedy the safety hazards, contrary to an OSHA order, but also deceived OSHA into believing the violations had been corrected. Id. at 411. The Court noted that the defendant "effectively

precluded OSHA from carrying out its mandate to protect the life and health of [defendant's] workers." Ibid. (alteration in original) (quoting Laidlow, 170 N.J. at 621). The Court concluded the Legislature "never intended such conduct to constitute a part of everyday industrial life" nor would the Legislature expect this conduct to fall within the workers' compensation bar. Ibid.

Most recently, the Court addressed the intentional wrong exception in Van Dunk. In that case, the Court concluded that neither the conduct nor context prongs were satisfied. 210 N.J. at 454. Van Dunk had volunteered to go into a deep trench to fix fabric that was being laid. Ibid. The supervisor instructed him not to do so because of the risk the trench would collapse. Ibid. Nonetheless, as problems persisted, the supervisor in a moment of frustration told Van Dunk to enter the trench and fix the fabric. Ibid. The trench collapsed, causing injury. Id. at 454–55.

During the OSHA investigation, the supervisor acknowledged he was aware of the OSHA requirements and did not follow those standards. Id. at 455. That admission led OSHA to cite the company for a "willful" violation of the safety standards. Ibid. The classification of the OSHA violation as willful does not necessarily mean, however, that the conduct is intentional wrong for purposes of the WCA. In determining that the conduct prong had not been

satisfied, the Court compared the nature of the wrong with the "more egregious circumstances" of prior cases.  Id. at 471.  The Court explained:

> What distinguishes Millison, Laidlow, Crippen, and Mull from the present matter is that those cases all involved the employer's affirmative action to remove a safety device from a machine, prior OSHA citations, deliberate deceit regarding the condition of the workplace, machine, or, in the case of Millison, the employee's medical condition, knowledge of prior injury or accidents, and previous complaints from employees.
>
> [Ibid.]

The Court noted that the plaintiff's failure to satisfy the conduct prong was sufficient to bar the lawsuit.  The Court nonetheless proceeded to examine the context prong, concluding that it also had not been established.  The Court explained:

> The separate consideration required by the context prong acts as an additional check against overcoming the statutory bar to a common-law tort action.  It was added to the analysis to reinforce the strong legislative preference for the workers' compensation remedy.  That preference is overcome only when it separately can be shown to the court, as the gatekeeper policing the Act's exclusivity requirement, that as a matter of law an employee's injury and the circumstances in which the injury is inflicted are "plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act."  In Millison, that threshold was only met by virtue of the physicians' intentional deception about the true status of employees' medical conditions when returning the employees to the

hazardous worksite, not by the dangers present in the workplace itself due to the known presence of asbestos.

[Id. at 473–74 (emphasis omitted) (citations omitted).]

The Court then applied those principles to the facts presented in the case before it, noting:

One cannot reasonably conclude that the type of mistaken judgment by the employer and ensuing employee accident that occurred on this construction site was so far outside the bounds of industrial life as never to be contemplated for inclusion in the Act's exclusivity bar. While a single egregiously wrong act by an employer might, in the proper circumstances, satisfy the intentional-wrong standard, not every intentional, or indeed willful violation of OSHA safety requirements constitutes a wrong that is "plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act."

[Id. at 474 (emphasis omitted) (quoting Millison, 101 N.J. at 179).]

B.

We next apply the lessons from these Supreme Court cases to the facts presented in the matter before us. Hocutt contends he satisfied the conduct prong because he was injured "as a result of a repeated practice, known to the defendant to be 'clearly a safety violation' and which constituted a 'serious' OSHA violation." We disagree. We believe the present circumstances are closer to the facts presented in Van Dunk than to Millison, Laidlow, Mull, and

20

Crippen because in the case before us there was no deception, no prior accidents, and no prior complaints.

As the Court made clear in Laidlow, an OSHA violation standing alone is not enough to establish intentional wrong. 170 N.J. at 622–23. Indeed, the Court in Van Dunk concluded that the plaintiff failed to show intentional wrong notwithstanding that the employer was cited for a violation that OSHA classified as "willful." 210 N.J. at 455.[2]

We turn then to Hocutt's contention that Minda's violative conduct rises to the level of intentional wrong because it occurred repeatedly. We start by acknowledging that Millison, Laidlow, Mull, and Crippen all involved repetitive wrongful acts. Van Dunk, in contrast, involved an isolated and spontaneous act of mistaken judgment by a supervisor. At first glance, that distinction might help to explain why intentional wrong was found in Millison, Laidlow, Mull, and Crippen but not in Van Dunk. On closer examination, however, we believe that the Court did not focus on the number of times the wrong act was repeated; rather, it focused on the aggravating circumstances in which that repetition occurred.

---

[2]  In this case, Minda was cited by OSHA for a "serious" violation, not a "willful" one as in Van Dunk.

The Court in Van Dunk cautioned that "a single egregiously wrong act by an employer might, in the proper circumstances, satisfy the intentional-wrong standard." 210 N.J. at 474. We do not interpret that observation to mean that less egregious acts satisfy the standard if they are committed repeatedly. Rather, we believe the Court was emphasizing that the egregiousness of the wrong act is more important than the number of times it is repeated.

That is not to suggest that repetition is irrelevant in determining the level of egregiousness. We must, however, examine the context in which those repeated acts occurred. The Millison line of cases make clear that a wrong act is more egregious when it is repeated in the face of efforts by government regulators or others to put a stop to the practice. The wrong act is especially egregious when deception is used to conceal the repetition.

Notably, in Millison, the repeated conduct was the deception committed by company doctors who misled multiple employees about their medical conditions. See Van Dunk, 210 N.J. at 474 (noting the intentional wrong threshold in Millison "was only met by virtue of the physicians' intentional deception about the true status of employees' medical conditions" (citing 101 N.J. at 181–83)).

In <u>Laidlow</u>, <u>Mull</u>, and <u>Crippen</u>, the employers refused to modify wrongful behavior that was specifically identified and brought to their attention. It was the employers' refusal to discontinue their wrongful practices in the face of such notice, not the wrongful practices themselves, that elevated their culpability to the level of intentional wrong.

We also need to consider how repetition of a wrong act should be accounted for when determining whether death or injury is substantially certain to result. The Court in <u>Millison</u> replaced the "deliberate intention" standard with a "substantial certainty" test. 101 N.J. at 178. As we have noted, this shift was meant to restrict, not expand, the circumstances when the intentional wrong exception applies. We do not believe, therefore, that the Court intended that a longstanding negligent or reckless practice should be deemed an intentional wrong under the WCA simply because the risk posed by the ongoing wrongful practice will eventually come to fruition under the law of probabilities.

Viewing the evidence in the light most favorable to Hocutt, we accept that there was a recurring practice at Minda's warehouse to allow workers to stand on moving forklifts. So far as the record before us shows, however, no accidents or injuries had resulted from the unsafe practice until Will backed into an I-beam with Hocutt aboard. The absence of proof of prior forklift

23 <span>A-4711-18T1</span>

accidents at Minda's warehouse suggests the unfortunate accident in this case was not a virtual certainty as demanded in <u>Millison</u>. 101 N.J. at 178.

The intentional wrong exception would significantly erode the legislative preference for the workers' compensation remedy if all a plaintiff has to show to invoke the exception is that the negligent or reckless conduct was a de facto company practice. As the Court cautioned in <u>Millison</u>, the line between negligent or reckless conduct and intentional wrong must be drawn with caution. Otherwise, the workers' compensation remedy would be "circumvented simply because a known risk later blossoms into reality." 101 N.J. at 178. Accordingly, we conclude that Hocutt failed to establish that Minda knew that its actions were substantially certain to result in Hocutt's injury or death.

It bears noting, moreover, that Hocutt alleged only negligence in his complaint. He never filed a pleading alleging that Minda engaged in any intentional act. We do not mean to suggest that the failure to allege intentional conduct precludes a finding of intentional wrong for the purposes of the WCA exemption. Nor would such a pleading automatically satisfy the <u>Millison</u> test. The point, rather, is that the nature of the complaint is telling with respect to the level of Minda's culpability.

A-4711-18T1

In sum, we interpret the precedents to mean that an employer's longstanding practice of violating an OSHA regulation does not automatically rise to the level of intentional wrong. Rather the escalation to intentional wrong generally occurs when the repeated conduct is committed in disregard of prior OSHA citations or other warnings. In this case, there were no proofs submitted showing that there were prior forklift-related accidents or injuries, prior OSHA violations pertaining to forklift operations, a failure to abate such OSHA violations, or prior complaints from workers about forklift practices. Nor was any evidence presented that Minda took steps to conceal its violative practice or otherwise deceive safety investigators.

Given the absence of evidence of prior accidents or OSHA citations, and the absence of any evidence of concealment, fraud, or deception, we believe that Minda's conduct was less egregious than the conduct in Millison, Laidlow, Mull, and Crippen, and more comparable to the wrongful conduct in Van Dunk. We therefore conclude that Hocutt has failed to establish the first prong of the Millison test.

C.

Our conclusion that Hocutt has failed to satisfy the conduct prong of the Millison test means that he is barred from suing Minda. We nonetheless follow the example the Supreme Court set in Van Dunk and proceed to address

the context prong. See 210 N.J. at 473 ("We have concluded that the conduct prong is not satisfied in this matter. Although that renders the context prong analysis unnecessary, we choose to address it."). In doing so, we recognize that the same facts and circumstances that led us to conclude that the first prong was not satisfied also militate against Hocutt's arguments with respect to the second prong. See Laidlow, 170 N.J. at 606–07 (noting that the deceptively timed engaging and disengaging of safety equipment to mislead inspectors satisfied both the conduct and context prongs).

We conclude that Hocutt has failed to show that his injury and the circumstances of its infliction were "more than a fact of life of industrial employment." Id. at 617. Hocutt does not dispute that forklift accidents occur in warehouses. As we have noted, the record in this case supports the inference that Minda allowed workers to stand on forklifts to hasten the pace with which pallets were loaded and unloaded and thus to enhance productivity and profit. This unsafe practice thus appears to reflect a deliberate decision by warehouse supervisors to expedite the movement of goods within the warehouse. That circumstance, however, does not by itself transform the company's negligence or recklessness into intentional wrong within the meaning of the WCA. As we have noted, we believe the Court in Millison abandoned the "deliberate intention" standard in recognition that many unsafe

workplace practices are deliberate in the sense that the employers made a business decision to maximize speed and efficiency at the expense of worker safety. We believe such decisions are a type of mistaken judgment that is a fact of life in industrial workplaces.

We do not mean to condone such practices. It is, in our view, the employer's response to an accident, regulatory citation, employee complaint, or other explicit warning that provides an especially useful benchmark of its culpability under both prongs of the Millison analytical framework. In this instance, given the absence of prior accidents or employee complaints, and especially given the absence of fraud, concealment, or deception, we do not believe Minda's misconduct was plainly beyond anything the Legislature intended the WCA to immunize. Laidlow, 170 N.J. at 617. In the final analysis, Minda's mistaken judgment was, to borrow the Court's aphorism in Van Dunk, "an exceptional wrong, not an intentional wrong." 210 N.J. at 472. Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION